Raymond P. ZAJAC and Helen Ann Zajac, Appellants,

v.

FEDERAL LAND BANK OF ST. PAUL, Appellee.

No. 88–5353ND.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 19, 1990.

Decided July 31, 1990.

Mark A. Bohnhorst, St. Paul, Minn., for appellants.

James B. Loken, Minneapolis, Minn., for appellee.

Before LAY, Chief Judge, HEANEY, Senior Circuit Judge, McMILLIAN, ARNOLD, JOHN R. GIBSON, FAGG, BOWMAN, WOLLMAN, MAGILL, and BEAM, Circuit Judges, En Banc.

FAGG, Circuit Judge.

Raymond P. and Helen Ann Zajac appeal from a district court order dismissing their lawsuit against the Federal Land Bank of St. Paul (the Bank) to enforce borrowers' rights provisions of the Agricultural Credit Act of 1987 (the Act). *See* 12 U.S.C. §§ 2202–2202a (1988). In *Harper v. Federal Land Bank of Spokane*, 878 F.2d 1172, 1173 (9th Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 867, 107 L.Ed.2d 951 (1990), the Ninth Circuit held the Act does not provide an implied private right of action for farmer-borrowers. After the Supreme Court denied the petition for certiorari in *Harper*, the Tenth Circuit embraced the Ninth Circuit's holding. *Griffin v. Federal Land Bank of Wichita*, 902 F.2d 22, 24 (10th Cir.1990). We now join in the holdings of *Harper* and *Griffin* and affirm the decision of the district court.

The Zajacs contend the Agricultural Credit Act of 1987 implies a private right of action permitting them to enforce the Act's borrowers' rights provisions. The Zajacs correctly recognize that, "[i]n implied right of action cases, we employ the [tests announced in *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975), ] to determine 'whether Congress intended to create [a] private remedy.'" *Wilder v. Virginia Hosp. Ass'n*, —— U.S. ——, —— n. 9, 110 S.Ct. 2510, 2517 n. 9, 110 L.Ed.2d 455 (1990) (quoting *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 15, 100 S.Ct. 242, 245, 62 L.Ed.2d 146 (1979)). Since the Ninth Circuit in *Harper* also recognized *Cort* as controlling, 878 F.2d at 1174, we consider the Zajacs' contention in the framework of the *Harper* decision.

The Zajacs first argue farmer-borrowers comprise a class " 'for whose especial benefit the [Act] was enacted.'" *Cort*, 422 U.S. at 78, 95 S.Ct. at 2088 (emphasis and quoted citation omitted). Although the Bank conceded at oral argument that farmer-borrowers represent a class intended to benefit from the Act, the Ninth Circuit has concluded Congress addressed the Act primarily to the financial crisis in the Farm Credit System, *Harper*, 878 F.2d at 1174–75. We need not decide which of these views should prevail because the Zajacs cannot make the other showings required by *Cort*. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 388, 102 S.Ct. 1825, 1844, 72 L.Ed.2d 182 (1982) (quoting *California v. Sierra Club*, 451 U.S. 287, 302, 101 S.Ct. 1775, 1783, 68 L.Ed.2d 101 (1981) (Rehnquist, J., concurring)).

The Zajacs next argue the Act's legislative history supports an implied private right of action even though "an express private right of action was proposed in both houses of Congress," *Harper*, 878 F.2d at 1176, and the conference committee considering the House and Senate bills chose to delete the private right of action provision from the final version of the Act, *see* H.R.Conf.Rep. No. 490, 100th Cong., 1st Sess. 178, *reprinted in* 1987 U.S.Code Cong. & Admin.News 2956, 2973. We disagree. The conference committee's report stating that the committee deleted the private right of action provision " 'represents the final statement of the terms agreed to by both houses.'" *Harper*, 878 F.2d at 1176 (quoting *Demby v. Schweiker*, 671 F.2d 507, 510 (D.C.Cir.1981)). " '[N]ext to the statute itself it is the most persuasive evidence of congressional intent.'" *Id.; see also United States v. Jones*, 811 F.2d 444, 447 (8th Cir.1987). The Zajacs nevertheless contend congressional statements made during floor debate on the House and Senate versions of the Act show the private right of action provision was deleted by the conference committee because some mem-

bers of Congress mistakenly believed farmers already had the right to bring suit in federal court. This contention is misplaced. Nothing in the conference committee's report suggests the committee gave any weight to the congressional statements. Indeed, "[t]o permit [the Act's final version] to be materially altered by [these] colloquies, which [took] place before the [Act] ha[d] achieved its final form, would open the door to the inadvertent, or perhaps even planned, undermining of the language actually voted on by Congress and signed into law by the President." *Harper*, 878 F.2d at 1176 (quoting *Regan v. Wald*, 468 U.S. 222, 237, 104 S.Ct. 3026, 3035, 82 L.Ed.2d 171 (1984)).

The Zajacs also argue the comprehensive administrative remedies provided by the Act do not show Congress intended to withhold private enforcement of the borrowers' rights provisions. Again, we disagree. "'The presumption that a [private] remedy was deliberately omitted from a statute is strongest when Congress has enacted a comprehensive legislative scheme including an integrated system of procedures for enforcement.'" *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 147, 105 S.Ct. 3085, 3093, 87 L.Ed.2d 96 (1985) (quoting *Northwest Airlines, Inc. v. Transport Workers Union*, 451 U.S. 77, 97, 101 S.Ct. 1571, 1583–84, 67 L.Ed.2d 750 (1981)). In this instance, the Act provides what the Zajacs themselves consider "a series of detailed and precise procedural rights[,] all of which are ... phrased in mandatory terms." We thus agree with *Harper* that "Congress intended administrative review to be the exclusive remedy" for violations of the Act. 878 F.2d at 1176.

Finally, the Zajacs argue the rights Congress created in the Act address the exclusively federal concern of keeping farmers on their land. We cannot ignore, however, the section of the Act that restricts foreclosure proceedings. *See* 12 U.S.C. § 2202a(b)(3). Because foreclosure is an area "traditionally controlled by state law," *Harper*, 878 F.2d at 1177, "it would be inappropriate to infer a [private] cause of action based solely on federal law," *Cort*, 422 U.S. at 78, 95 S.Ct. at 2088.

Having carefully considered all of the Zajacs' arguments, we agree "the Ninth Circuit's analysis in *Harper v. Federal Land Bank of Spokane* is correct." *Griffin*, 902 F.2d at 24. We thus join the Ninth and Tenth Circuits in holding there is no implied private right of action available to enforce the Act, and affirm the district court.

ARNOLD, Circuit Judge, concurring in the judgment, with whom McMILLIAN, Circuit Judge, joins.

I fully agree with Judge Heaney's persuasive dissenting opinion with respect to a private right of action for farmer-borrowers under the Agricultural Credit Act of 1987. I would nevertheless affirm this judgment, on the ground that the Anti–Injunction Act, 28 U.S.C. § 2283, deprived the District Court of jurisdiction to entertain this suit for an injunction against a proceeding pending in a state court. Accordingly, I concur in the result reached by the Court en banc, which is to affirm.

According to the dissenting opinion, the Anti–Injunction Act is not a bar when "an Act of Congress, clearly creating a federal right or remedy enforceable in a federal court of equity, could be given its intended scope *only* by the stay of a state court proceeding." *Mitchum v. Foster*, 407 U.S. 225, 238, 92 S.Ct. 2151, 2160, 32 L.Ed.2d 705 (1972) (emphasis added), quoted by the dissent, *post* pp. 1192–1193. I agree that this is the correct standard. I cannot agree that it is met in this case. The Zajacs were completely free to set up, by way of defense to the state-court foreclosure proceeding, their rights to an independent appraisal under the Agricultural Credit Act of 1987. This is true though during the foreclosure proceeding, and indeed for almost a month after judgment had been entered against them, their rights under the Act were uncertain. The Technical Corrections Act of 1988—retroactively amending the 1987 Act to accord with the Zajacs' interpretation that it required an independent appraisal when restructuring is proposed—was approved by Congress and signed by the President in late August

1988. At that time, the Zajacs' appeal of foreclosure was still pending before the North Dakota Supreme Court. This federal defense, if ultimately rejected by the state courts, could have been vindicated by the Supreme Court of the United States on appeal from the Supreme Court of North Dakota. (The remedy now would be by certiorari, rather than by appeal, because most of the Supreme Court's mandatory jurisdiction has been repealed, but the point remains that a federal court would be available to vindicate this federal right, if the state courts should disregard it.) It therefore cannot be said that the *only* way for the Zajacs' federal statutory rights to be enforced was by suit for injunction in a federal district court. The state courts are open to consider, and in fact are obligated under the Supremacy Clause to consider, assertions of federal statutory right, whether they arise as part of someone's claim or as part of a defense.

The Anti–Injunction Act embodies a fundamental policy of federalism. It is a limitation on the jurisdiction of the federal courts, and one that should be scrupulously observed. Exceptions to the Act should be narrowly construed, and doubts should be resolved in favor of applying it. *Atlantic Coast Line R.R. v. Brotherhood of Locomotive Engineers*, 398 U.S. 281, 90 S.Ct. 1739, 26 L.Ed.2d 234 (1970). On this basis, I would affirm the District Court's dismissal of this case.

HEANEY, Senior Circuit Judge, dissenting with whom LAY, Chief Judge, joins.

We are always hesitant to create a conflict between circuits on important issues of the law. This is one instance, however, in which we should not hesitate to set forth our own view on the question of whether farm borrowers have a private right of action to enforce the borrowers' rights provisions of the Agricultural Credit Act of 1987. In my view, *Harper* was wrongly decided. *Harper* ignored the plain and mandatory language of the Act, wrongly decided that the major objective of the Act was to preserve the financial viability of the Farm Credit System and neglected the

equally important objective of empowering farm borrowers with certain prescribed rights. *Harper* also refused to give weight to the clear statements of the managers of the bill on the floor of the Senate regarding the intent of Congress with respect to borrowers' rights. Finally, *Harper* wrongly concluded that Congress intended administrative review to be the exclusive remedy when, in fact, the Farm Credit Administration has neither entertained an action to enforce borrowers' rights nor possessed the power to do so. In sum, the failure to imply a private right of action contradicts the intent of Congress.

## BACKGROUND

In 1980, the Zajacs borrowed $250,000 from the Bank. By 1986, they were unable to continue making payments, and the Bank commenced foreclosure proceedings in state court. The Zajacs raised a number of defenses to the action. On December 14, 1987, the state court issued a decision in favor of the Bank.

The Bank delayed entry of its state court foreclosure judgment to afford the Zajacs an opportunity to restructure their loan under sections 102 and 106 of the Agricultural Credit Act of 1987, 12 U.S.C. §§ 2202 and 2202a.

The Zajacs submitted an application for restructuring, which was considered but denied by the Bank on April 15, 1988, on the ground that the Bank would incur a greater loss under the Zajacs' restructuring proposal than would occur through a sale of the property at foreclosure. The Zajacs appealed that decision to the Bank's credit review committee. They asked the committee to appoint an independent appraiser pursuant to procedures required by the Act. The committee refused and, after a hearing, denied the Zajacs' application for restructuring. Judgment of foreclosure was entered by the state court on May 6, 1988.

The Zajacs appealed the judgment of foreclosure to the Minnesota Supreme Court and moved for a stay of judgment.

The motion was denied, and the trial court was affirmed.

At that point, the Zajacs asked the United States District Court to enjoin the Bank from conducting a sheriff's sale on their land until the Bank had complied with certain borrowers' rights provisions of the Act, including the provision mandating an independent appraisal. The district court denied the Zajacs' motion after hearing. It held that there is no express or implied private right of action for failure to comply with the borrowers' rights provisions of the Act, that the Act did not require an independent appraisal of the Zajacs' land,[1] that the Bank's decision to deny restructuring was a commercial banking decision, and that the relief requested would violate the Federal Anti–Injunction Act, 22 U.S.C. § 2283.

## DISCUSSION

### I. IS THE BORROWER'S PROCEDURAL RIGHT TO HAVE AN INDEPENDENT APPRAISER APPOINTED ENFORCEABLE IN FEDERAL COURTS?

The Agricultural Credit Act of 1987 provides detailed procedures and formulae under which a borrower can seek to have a distressed loan restructured.[2] System lenders are required to restructure loans unless the cost of restructuring exceeds the cost of foreclosure.[3] Restructuring is defined as follows:

---

**1.** The lower court concluded from the statutory language that credit review committees have no legal obligation to appoint an independent appraiser in restructuring situations. The Zajacs argue that the lower court's interpretation is incorrect because it ignores the Agricultural Technical Corrections Act of 1988, which clearly states that borrowers have a right to an independent appraisal on review of a denial of restructuring. The Bank argues that the Technical Corrections Act should not apply retroactively in this case. I disagree with the Bank and believe that the district court erred. Section 1001 of the Technical Corrections Act provides that the amendments made by the Act "shall take effect as if enacted immediately after the enactment of the 1987 Act." Pub.L. No. 100–399, § 1001, 102 Stat. 989, 1008 (1988). Since the Agricultural Credit Act of 1987 became operative on January 6, 1988, the Technical Corrections Act became operative well before the Zajacs requested the independent appraisal in April 1988. Moreover, there is no manifest injustice to the Bank from such retroactive application because the Bank presumably knew the state of the law in May 1988 when it denied the Zajacs' request for an independent appraisal. Thus, the cases cited by the Bank in its brief are inapposite.

**2.** 12 U.S.C. § 2202a(a)(3) provides as follows:
The term "distressed loan" means a loan that the borrower does not have the financial capacity to pay according to its terms and that exhibits one or more of the following characteristics:
(A) The borrower is demonstrating adverse financial and repayment trends.
(B) The loan is delinquent or past due under the terms of the loan contract.
(C) One or both of the factors listed in subparagraphs (A) and (B), together with inadequate collateralization, present a high probability of loss to the lender.

*Id.*

**3.** 12 U.S.C. § 2202a(a)(2) and (e) provide as follows:
(a)(2) **Cost of foreclosure**
The term "cost of foreclosure" includes—
(A) the difference between the outstanding balance due on a loan made by a qualified lender and the liquidation value of the loan, taking into consideration the borrower's repayment capacity and the liquidation value of the collateral used to secure the loan;
(B) the estimated cost of maintaining a loan as a nonperforming asset;
(C) the estimated cost of administrative and legal actions necessary to foreclose a loan and dispose of property acquired as the result of the foreclosure, including attorneys' fees and court costs;
(D) the estimated cost of changes in the value of collateral used to secure a loan during the period beginning on the date of the initiation of an action to foreclose or liquidate the loan and ending on the date of the disposition of the collateral; and
(E) all other costs incurred as the result of the foreclosure or liquidation of a loan.

.     .     .     .     .

(e)(1) **Restructuring in general**
If a qualified lender determines that the potential cost to such qualified lender of restructuring the loan in accordance with a proposed restructuring plan is less than or equal to the potential cost of foreclosure, *the qualified lender shall restructure the loan in accordance with the plan.*
(2) **Computation of cost restructuring**
In determining whether the potential cost to the qualified lender of restructuring a distressed loan is less than or equal to the potential cost of foreclosure, a qualified lender *shall consider* all relevant factors, including—

The terms "restructure" and "restructuring" include rescheduling, reamortization, renewal, deferral of principal or interest, monetary concessions, and the taking of any other action to modify the terms of, or forbear on, a loan in any way that will make it probable that the operations of the borrower will become financially viable.

12 U.S.C. § 2202a(a)(7). If the lender rejects the request for restructuring, further procedures can be instituted by the borrower. The borrower can request a review of that decision. 12 U.S.C. § 2202(b)(1). As an aspect of that review, the Act grants a borrower the right to an independent appraisal. 12 U.S.C. § 2202(d).

In determining whether the Zajacs have an implied cause of action to assert a borrower's procedural right to an independent appraisal and other mandated procedures under the Act, congressional intent is the ultimate issue. *Thompson v. Thompson,* 484 U.S. 174, 179, 108 S.Ct. 513, 516, 98 L.Ed.2d 512 (1988). In *Thompson,* the Supreme Court defined the implied cause of action doctrine and rearticulated the *Cort v. Ash* analysis.

In determining whether to infer a private cause of action from a federal statute, our focal point is Congress' intent in enacting the statute. As guides to discerning that intent, we have relied on the four factors set out in *Cort v. Ash,* 422 US 66, 78, 45 L Ed 2d 26, 95 S Ct 2080 [2088] (1975), along with other tools of statutory construction.... Our focus on congressional intent does not mean that we require evidence that Members of Congress, in enacting the statute, actually had in mind the creation of a private cause of action. *The implied cause of action doctrine would be a virtual dead letter were it limited to correcting*

*drafting errors when Congress simply forgot to codify its evident intention to provide a cause of action. Rather, as an implied cause of action doctrine suggests, "the legislative history of a statute that does not expressly create or deny a private remedy will typically be equally · silent or ambiguous on the question."* Cannon v. University of Chicago, 441 US 677, 694, 60 L Ed 2d 560, 99 S Ct 1946, [1956] (1979). We therefore have recognized that Congress' "intent may appear implicitly *in the language or structure of the statute, or in the circumstances of its enactment."* Transamerica Mortgage Advisors, Inc. v. Lewis, 444 US 11, 18, 62 L Ed 2d 146, 100 S Ct 242 [246] (1979).

*Thompson,* 484 U.S. at 179, 108 S.Ct. at 516 (emphasis added).

## A. Language and Structure

The 1987 Act emphasizes that borrowers have the power to initiate certain procedures. Part C of the Act is entitled *"Rights of Borrowers; Loan Restructuring."* One of the rights enumerated therein is the right to an independent appraisal at the credit review committee stage of a restructuring proceeding. The pertinent part of the Act reads as follows:

An appeal filed with a credit review committee under this section may include, as a part of the request for a review of the decision filed under subsection (b)(1) or (2) of this section, a request for an independent appraisal, by an accredited appraiser, of any interests in property securing the loan (other than the stock or participation certifications of the qualified lender held by the borrower).

.　　.　　.　　.　　.

(A) the present value of interest income and principal forgone by the lender in carrying out the restructuring plan;

(B) reasonable and necessary administrative expenses involved in working with the borrower to finalize and implement the restructuring plan;

(C) whether the borrower has presented a preliminary restructuring plan and cash-flow analysis taking into account income from all

sources to be applied to the debt and all assets to be pledged, showing a reasonable probability that orderly debt retirement will occur as a result of the proposed restructuring; and

(D) whether the borrower has furnished or is willing to furnish complete and current financial statements in a form acceptable to the institution.

*Id.* (emphasis added).

Within 30 days after a request for an appraisal under paragraph (1), the credit review committee *shall present* the borrower with a list of three appraisers approved by the appropriate qualified lender from which the borrower *shall select* an appraiser to conduct the appraisal the cost of which *shall be borne* by the borrower and *shall consider the results of such appraisal in any final determination with respect to the loan.*

.    .    .    .    .

A copy of any appraisal made under this subsection shall be provided to the borrower.

12 U.S.C. § 2202(d)(1), (2), (3) (emphasis added).

The language requiring the appointment of an independent appraiser upon request is mandatory rather than permissive. The System lender is directed to follow the statutory procedure. The only discretion left to the lender and the credit review committee is to present the borrower with a list of three appraisers from which the borrower can select. Having done this, the committee must consider the results of the appraisal in any final determination with respect to the loan.

The language used by Congress with respect to the other borrowers' rights provisions is also mandatory in setting forth exceedingly detailed procedures that System lenders must follow. Thus, the Act provides, inter alia:

(a) That when it is determined that a loan made by a lender is distressed, the lender *shall* provide written notice to the borrower that the loan may be suitable for restructuring.

12 U.S.C. § 2201(b).

(b) That not later than 45 days before a lender begins foreclosure proceedings, the lender *shall* notify the borrower that the loan may be suitable for restructuring.

12 U.S.C. § 2202a(b)(2).

(c) That *no lender may* foreclose a distressed loan before the lender has completed consideration of the loan for restructuring.

12 U.S.C. § 2202a(b)(3).

(d) That the lender *shall* provide a reasonable opportunity for the borrower to meet personally with a representative of the lender.

12 U.S.C. § 2202a(c).

(e) That if the lender determines that the potential cost of restructuring a loan in accordance with a post-restructuring plan is less than or equal to the potential cost of foreclosing, the qualified lender *shall* restructure the loan in accordance with the plan.

12 U.S.C. § 2202a(e)(1).

The detail and precision with which Congress set forth borrowers' rights under this section are powerful indicators Congress' intent to confer specific enforceable rights on borrowers. A private cause of action will be found readily " 'where the language of the statute explicitly confer[s] a right directly on a class of persons that include[s] the plaintiff.' " *Universities Research Ass'n v. Coutu*, 450 U.S. 754, 771–72, 101 S.Ct. 1451, 1462, 67 L.Ed.2d 662 (1981) (quoting *Cannon v. University of Chicago*, 441 U.S. 677, 690 n. 13, 99 S.Ct. 1946, 1954 n. 13, 60 L.Ed.2d 560 (1979)); *Miener v. State of Mo.*, 673 F.2d 969, 974 n. 4 (8th Cir.1982). Thus, if a System lender grants the specific rights mandated by the Act, no further purpose is served by a judicial review of the lender's ultimate decision regarding foreclosure or restructuring. *See Coutu*, 450 U.S. at 772, 101 S.Ct. at 1462. The *Harper* court ignored the plain language of the Act in reaching its decision.[4]

---

4. On this point, rather than relying on the flawed reasoning of *Harper*, the majority simply declares that the determination of whether the Act was enacted for the "especial benefit" of borrowers is irrelevant to its analysis under *Cort v. Ash*. This reasoning cannot be reconciled with Chief Justice Rehnquist's concluding statement in his concurring opinion in *Califor-*

*nia v. Sierra Club*, 451 U.S. 287, 301–03, 101 S.Ct. 1775, 1783–84, 68 L.Ed.2d 101 (1981) (Rehnquist, C.J., concurring).

… I am happy to agree with the Court that there is no implied right of action because "[t]he language of the statute and its legislative history do not suggest that the Act was intended to create federal rights for the espe-

The reasons why Congress found it necessary to adopt detailed borrowers' rights are set forth more fully in subsequent sections of this dissent. Suffice it to say that earlier efforts of Congress to encourage restructuring of distressed loans had been ignored by many System lenders and Congress intended to remedy this situation. *Harper*, which the majority follows, relegates the language and structure of the statute to insignificant status under its *Cort v. Ash* analysis. *See Harper*, 878 F.2d at 1174–75 (specifically holding that the district court erred when it concluded that the language of the Act implies a private right of action because that conclusion somehow conflicts with statements on the floor of the Senate that the major impetus of the Act was to preserve the Farm Credit System). By ignoring the language and structure of the Act, the Ninth Circuit has modified the *Cort v. Ash* analysis to a determination of whether the legislative history *alone* creates an implied cause of action. As long as the implied cause of action doctrine exists, the dominant focus must be the language and structure of the Act in question. *See Thompson*, 484 U.S. at 187, 108 S.Ct. at 520. Because the language of the Act is so clear, it would be proper to rest our case on that language, but the clear language is also supported by the legislative history of the Act.

### B. *The House Report*

The House Report sets forth the twofold purpose of the Act. It stated:

> H.R. 3030 *will require* Farm Credit System lenders to restructure the loans of financially-stressed farmer-borrowers, in order to help keep farmers on the land and help turn around the condition of stressed System institutions.

H.R.Rep. No. 295(I), 100th Cong., 1st Sess. 52 (emphasis added), *reprinted in* 1988 U.S.Code Cong. & Admin.News 2723, 2773.

It went on to say:

Much of the impetus for H.R. 3030 derives from the continuing depression in agriculture that began in the early 1980's but whose roots originate in the inflationary period in the late 1960's and 1970's.

. . . . .

> H.R. 3030 ... looks to the future—to an agricultural delivery system that not only will have dealt sensitively with today's financially-stressed farm borrowers but one that will be more competitive, more efficient and more responsive to economic realities.

*Id.* at 53–54, *reprinted in* 1988 U.S.Code Cong. & Admin.News at 2725.

The Report further states that the highlights of H.R. 3030 include:

> *Providing enhanced borrowers' rights and requiring restructuring rather than foreclosure of certain loans.*

*Id.* (emphasis added).

In discussing the testimony of the various witnesses to appear before the House committee, the Report states:

> Dozens of witnesses representing farmer and commodity groups testified before the Committee as to two basic weaknesses in the way many System institutions have dealt with its problems. First, System lenders have been exceedingly reluctant to restructure individual loans on a case-by-case basis; and, second, the tensions and pressures on both borrowers and lenders, brought on by financial distress, have caused collapse of the traditional sense of comity and good will between the System and its borrower/owners.

*Id.* at 62, *reprinted in* 1988 U.S.Code Cong. & Admin.News at 2733.

The Report went on to state:

> Complaints about the rights of System borrowers being abused at both the association and district levels have been like a constant drumbeat in the offices of some Members of Congress for several years. The package of borrower rights adopted

---

cial benefit of a class of persons," ante, at 297–298, [101 S.Ct. at 1781], 68 L Ed 2d, at 110–111, and because there is no "evidence that Congress anticipated that there would be

a private remedy." Ante at 298 [101 S.Ct. at 1781], 68 L Ed 2d, at 110.
*Id.* at 303, 101 S.Ct. at 1784.

in H.R. 3030 reflect a common sense approach which should have been standard operating procedures in a cooperative, borrower-owned lending system.

*Id.* at 64, *reprinted in* 1988 U.S.Code Cong. & Admin.News at 2735.

## C. *The Senate Report*

In forwarding the Act to the floor of the Senate, the Senate Committee on Agriculture, Nutrition and Forestry stated that the Act called "for a major reorganization of the credit delivery mechanism for American agriculture" to assure economic security for the family farmer and rancher and stability of the Farm Credit System. S.Rep. 230, 100th Cong., 1st Sess. 21 (1987). One of the major elements of this reorganization was the mandated restructuring of distressed loans. This was necessary because System lenders were not restructuring when restructuring was cost-effective. The Act

> requires that System banks and associations receiving assistance must, in turn, assist troubled farmers and ranchers by restructuring their delinquent loans where that restructuring is less costly than foreclosure. Each Farm Credit System (FCS) District, that contains a System institution certified to receive assistance must establish a Special Asset Group to review each loan of a distressed farmer or rancher that is slated for foreclosure.
>
> These restructuring procedures were modeled after the St. Paul FCS District's restructuring program—farmers had their loans restructured when that was beneficial both to the System and the farmer. This program has helped thousands of needy farmers *and* has generated income for the System. Applying these procedures nationally will help alleviate a major drain on the System....

*Id.* at 3. The Senate Report notes that the Senate bill granted farmer-borrowers specific rights to ensure an accurate determination of whether restructuring was cost-effective.

> Title IV provides farmer-borrowers with important rights—including the right to loan information (regarding differential interest rates, and loan origination charges, changes in interest rates and loan options) and the right of first refusal to repurchase or lease land formerly owned by a borrower that has been foreclosed on by a System institution. Providing borrowers with advance and accurate loan information will allow them to make better informed financial decisions.
>
> Also, banks and associations *will be required* to use Credit Review Committees to review denials of new loans and restructuring of distressed loans. In order to both assist the institution, by creating earning assets, and to help the family farmer in all System institutions, the distressed loans of family farmers *must be restructured* under Title IV if the cost of restructuring is less than the cost of foreclosure.

*Id.* at 4–5 (emphasis added).

By granting farmer-borrowers certain specific rights, the Senate also intended to remedy many of the drastic consequences, caused by the agricultural depression of the 1980s, including the tremendous number of foreclosures forcing farm families out of their homes.

> The agricultural depression of the 1980's rivals that of the 1930's in terms of its impact on farmers.
>
> .    .    .    .    .
>
> Farmers who either began operating in the 1970's or significantly expanded their operations in this period are most affected by the decline in land values because they have the greatest amount of debt. However, even farmers with no debt, who are close to retirement, have seen their net worth and hence their retirement savings stripped away by the collapse of farmland values.
>
> While debt has fallen significantly in the last three years the burden has not been uniformly reduced. Many of those reducing their debt holdings were able to do so because they had relatively low levels of debt relative to their income. Most disturbing to the Committee, the other major group causing the fall in

debt has been those farmers forced off their farms as a result of their inability to meet their commitments to lenders. While roughly 40 percent of farmers have no debt some 10–12 percent of farmers holding 37 percent of the total debt are in extreme financial difficulty. *Id.* at 14.

Senator Boren (D–Okla.), the Senate manager of the bill, stated upon introduction of the bill to the Senate floor:

All institutions *must* restructure an eligible borrower's nonaccruing loan if: First, it is cheaper to restructure than to foreclose; second, the borrower is applying all income over and above necessary and reasonable living and operating expenses; third, if the borrower has the financial capacity and management skills to protect the collateral; fourth, if the borrower is capable of working out existing financial difficulties.

.    .    .    .    .

Borrowers who request an appeal to the credit review committee may also request that an independent appraisal of the collateral securing the loan be conducted. If an independent appraisal is requested, the *committee must consider the results of the independent appraisal when making its final determination on the loan.*

133 Cong.Rec. S16831 (1987) (emphasis added). While the *Harper* court considered Congress' concern for the overall solvency of the Farm Credit System in the various legislative reports to indicate that Congress did not intend to create a private cause of action, *Harper,* 878 F.2d at 1177–78, the majority simply concludes that the conference committee's decision to eliminate the express cause of action is both the start and end of an inquiry under *Cort v. Ash.* The majority thereby ignores all other indicators of congressional intent, and its inquiry is inconsistent with *Thompson,* 484 U.S. at 179, 108 S.Ct. at 516. *See, supra* note 4.

### D. *The Conference Report*

The Conference Report reiterated the broad goal of the Act previously expressed in the House and Senate reports. The 1987 Act was enacted, first and foremost, "to provide credit assistance to farmers." H.R.Conf.Rep., 100th Cong., 1st Sess. 1 (1987). Chairman of the Conference Committee, Representative de la Garza of Texas, in reading the Conference Report to the House, clearly expressed what the Conference Committee thought to be the driving force for enactment of the Act: "the terrible problem that our farmers and ranchers in rural America have experienced during the past several years." 133 Cong.Rec. H11869 (1987). He went on to say:

Mr. Speaker, I hope that my colleagues will join with us to send the message at this point that we care, *that we would like for them to have another tool at their disposal,* which is credit of an acceptable nature so that they could continue providing us with the excellent food and fiber that they have done in the past.

*Id.* (emphasis added).

Senator McClure (R–Idaho), upon the return of the Conference Report to the Senate and just before final passage of the Act, expressed the sentiment of Congress in terms that few could misunderstand:

The most important part of this legislation … is the restructuring of farm loans of financially stressed farmer-borrowers of the System. In order to keep these farmers on the land it is necessary for System banks and associations to change their attitude toward debt restructuring. In the past if a farmer was delinquent or late in payment, it was almost automatic that the bank or association began foreclosure or liquidation action. The banks and associations were not focused on helping the farmer through restructuring. With mounting losses, it became clear that doing business as usual would not suffice. A more lenient attitude was needed. Because this was not forthcoming from the System, Congress made restructuring an integral part of the financial assistance package. If System banks were to receive assistance from the Congress, they must restructure farmer loans where it is cheaper. *This legislation requires re-*

*structuring of farmer loans if it is the least cost alternative.*

133 Cong.Rec. S18458, S18469–70 (1987) (emphasis added).

In light of the above, there certainly can be no quarrel that Congress viewed the Act as responsive to the needs of farmer-borrowers in ways that earlier Farm Credit Acts were not. Moreover, the Act clearly manifests Congress' intent to provide borrowers with the ability to enforce procedures granted to protect them from unjustified foreclosure. This can only be done by implying a private right of action for borrowers. *See infra* section G.

Implying a private right of action for borrowers to enforce carefully defined procedures mandated by the language of the Act is also consistent with the additional goal of the 1987 Act to strengthen and stabilize the Farm Credit System. The Act requires lenders to make cost-effective decisions concerning the possibility of restructuring. *See Harper v. Federal Land Bank*, 878 F.2d at 1175 ("the 1987 Act is further reinforced by the fact that a borrower's right to restructure a delinquent loan is limited to situations in which the cost of restructuring is less than or equal to the cost of foreclosure"). Granting borrowers a private right for injunctive relief requires lenders to weigh the costs of restructuring against the costs of foreclosure before resorting to the latter. Injunctive relief strengthens, rather than weakens, the Farm Credit System by requiring lenders to make a decision based on a thorough review of all factors and procedures deemed important by Congress.

### E. *Other Legislative History*

When the bill reached the floor of the Senate after committee hearings, Senator Burdick (D–ND) offered an amendment on the Senate floor to provide expressly that *any person* would have a right to sue under the Act. His concern was that the House bill, which conferred an express cause of action only on borrowers, was too narrow, eliminating existing rights.[5] He stated:

> Currently, any person has the right to sue these two entities. However, the House provision arguably limits this right to borrowers of the System. This restricts rights of persons who are not yet borrowers, or who are farmer-borrowers, to sue.

> My amendment simply cleans up this problem and restores the rights to all persons, whether borrowers or not.

133 Cong.Rec. S16995 (Dec. 7, 1987).

Senator Boren (D–Okla.), chairman of the Senate Subcommittee on Agricultural Credit and floor manager for the bill, responded as follows:

> I am told that the House has unduly restricted the right of the borrower to bring suit and that this is the proposal in the House bill. It would be my thought ... that we would oppose that House provision in the conference committee. That would have much the same effect

---

**5.** The House version of the 1987 Act included a provision that gave *borrowers* the right to sue any farm credit institution for violation "of any duty, standard, or limitation prescribed under the Act and owing to the borrower." H.R. 3030, 100th Cong., 1st Sess., 133 Cong.Rec. H7638, H7692 (Sept. 21, 1987).

Senator Burdick was obviously concerned that *applicants* for loans would be given rights but denied the right to enforce them under the House bill. He wanted to make sure that they, too, had the right to maintain an action to enforce the rights and procedures granted by the Act. His impression that, at the time, any person had the right to sue was not correct. This Circuit, for instance, held in *Redd v. Federal Land Bank of St. Louis,* 851 F.2d 219, 223 (8th Cir.1988), and *Mendel v. Production Credit Ass'n of the Midlands,* 862 F.2d 180 (8th Cir.1988),

that a borrower did not have the right to bring an action for damages under the 1985 amendments to the 1971 Farm Credit Act.

Much of the misunderstanding over the question of whether borrowers had a private right of action at the time Congress enacted the present Act stems from an apparent confusion between common law actions under state law and statutory actions. *See, e.g.,* 133 Cong.Rec. H00000–30 (consideration of H.R. 3030 on the floor of the House of Representatives, statements of Reps. Watkins, Madigan, and Glickman). At the time of enactment, some states permitted borrowers to use the Farm Credit Act of 1971 and its amendments as a defense to foreclosure. *See, e.g., Federal Land Bank of St. Paul v. Overboe,* 404 N.W.2d 445 (N.D.1987). *But see Production Credit Ass'n v. Van Iperen,* 396 N.W.2d 35 (Minn.Ct.App.1986).

as the adoption of the Burdick amendment would have without our attempting to write the actual language of the amendment here on the floor at this time.

Senator Lugar (R–Ind.), ranking minority member of the Senate Agriculture Committee, stated:

> I would confirm the understanding that the distinguished Senator from Oklahoma and I have with the distinguished author of this amendment. We will in fact oppose the House amendment in conference. We understand the problem, and we would appreciate the Senator's not pursuing this amendment on this occasion with that assurance.

*Id.* On the basis of these assurances, Senator Burdick withdrew his amendment and the bill passed.[6] This is both the best and only explicit explanation of why the cause of action provision was eliminated at Conference. To conclude otherwise, as the majority has, is to assume Congress' intent without support in the language, structure, or legislative history.

The comments of Senator Boren and Senator Lugar are not, as described by the Bank and the Ninth Circuit in *Harper*, 878 F.2d at 1176, isolated comments in the legislative record selected by plaintiffs to bolster their case. They were the comments by those in the Senate responsible for managing the Act through the legislative process.

### F. *Prior Case Law*

The Bank argues that earlier Farm Credit System cases decided by this Court involving the question of implied right to private actions militate against giving such rights here. I do not agree. To the contrary, I believe that the past cases of this Circuit support the right to equitable relief.

In *Allison v. Block*, 723 F.2d 631 (8th Cir.1983), we held that farmers were entitled to declaratory and injunctive relief against the Secretary of Agriculture and other officials enjoining them from foreclosing farm loans obtained from the Farmers Home Administration because the Secretary had failed to promulgate procedural and substantive regulations implementing legislation intended to defer farm loans in certain circumstances. The injunction prohibited the Secretary from foreclosing on farm loans until he had complied with the congressional Act.

In *Wilson, et al. v. Mason State Bank*, 738 F.2d 343 (8th Cir.1984), we held that the Wilsons could not maintain an action for *damages* against a private bank which had made a loan to the Wilsons under the Emergency Agricultural Adjustment Credit Act of 1978. Pub.L. No. 95–334, 92 Stat. 429–33 (appearing at 7 U.S.C. following section 1947) (1982). We distinguished *Allison v. Block* on the following grounds:

> *Allison* involved an action by a farmer against the Secretary of Agriculture to enforce the provisions of 7 U.S.C. § 1981a (1982). We found that in section 1981a, it was *Congress's intention to place an affirmative duty on the Secretary of Agriculture to establish procedures* to defer foreclosures on farm loans. We found that the purpose of the amendment was to benefit the farmers subject to foreclosure. We held that the Secretary's failure to establish such procedures was an abuse of discretion and granted the farmer injunctive relief. *Allison*, as such, *provides no support for the Wilsons' attempt to imply a private cause of action to recover money damages* for the Bank's alleged violations of regulations promulgated to protect FmHA.

*Wilson*, 738 F.2d at 345 (emphasis added).

In *State of Iowa ex rel. Miller v. Block*, 771 F.2d 347 (1985) (Heaney, J., joined by Lay, C.J., with Fagg, J., dissenting), we again granted relief to individual farmers

---

**6.** Senators Burdick, Boren, and Lugar, and the other congressmen who spoke, clearly intended that there be some form of judicial enforcement, at least the kind of judicial enforcement that is asked for in the instant case. On the other hand, there is not a single individual senator or congressman who stood up and said, "All right, constituents, we are giving $4 billion to bail out the Farm Credit System. Along with this, we are going to give farmer-borrowers specific rights, but we do not intend to make such rights enforceable in court."

who sought to compel the Secretary of Agriculture to develop a program for the making of "disaster payments" to Iowa farmers who suffered disasters within the meaning of the Act. We noted that:

> It is not the business of this Court to order the Secretary to make payments under the SDPP to specific farmers. But when Congress has created a program which contemplates that such payments will be made in appropriate circumstances, it is the clear duty of the Secretary to promulgate regulations which carry out the intent of Congress.

*Id.* at 352. We noted the importance of the "imperative language in the statute (*'shall'* make disaster payments)." *Id.* at 355.

In *Redd v. Federal Land Bank of St. Louis,* 851 F.2d 219, 223 (8th Cir.1988), we held that the 1985 amendments to the 1971 Farm Credit Act did not create an implied right of action *for damages.*

In *Mendel v. Production Credit Ass'n of the Midlands,* 862 F.2d 180 (8th Cir.1988), we followed *Redd* and held that neither the Farm Credit Act of 1971 nor the 1985 amendments created by implication a private right of action *for damages.* We specifically left open the question of whether farmer-borrowers might have a private right of action to enforce the provisions of the 1985 amendments.

Significant differences exist between the 1985 amendments and the 1987 Act. The 1985 amendments did not have a section entitled "Borrowers' Rights." Title III of the 1985 amendments was entitled: "TITLE III—PROTECTION FOR FARMERS AND OTHER FARM CREDIT SYSTEM BORROWERS; DISCLOSURE AND ACCESS TO INFORMATION." The 1985 amendments simply required that System lenders (1) provide to their borrowers meaningful and timely disclosure of interest rate information,[7] (2) develop a policy of forbearance,[8] (3) provide borrowers copies of loan documents,[9] (4) establish credit review committees,[10] and provide a loan re-

7. SEC. 4.13. DISCLOSURE.—(a) In accordance with regulations of the Farm Credit Administration, System institutions shall provide to their borrowers, for all loans that are not subject to the Truth in Lending Act (15 U.S.C. § 1601 et seq.), meaningful and timely disclosure of the following:
(1) the current rate of interest on the loan;
(2) in the case of an adjustable or variable rate loan, the amount and frequency by which the interest rate can be increased during the term of the loan or, if there are no such limitations, a statement to that effect, and the factors (including, but not limited to, the cost of funds, operating expenses, and provision for loan losses) that will be taken into account by the lending institution in determining adjustments to the interest rate;
(3) the effect, as shown by a representative example or examples, of the required purchase of stock or participation certificates in the institution on the effective rate of interest; and
(4) any change in the interest rate applicable to the borrower's loan.

8. SEC. 4.13. DISCLOSURE.—(b) In accordance with regulations of the Farm Credit Administration System institutions shall develop a policy governing forbearance. Each System institution shall provide borrowers with a copy of the institution's policy regarding forbearance at such time or times as the Farm Credit Administration shall prescribe in such regulations.

9. SEC. 4.13A. ACCESS TO DOCUMENTS AND INFORMATION.—In accordance with regulations of the Farm Credit Administration System institutions shall provide their borrowers, at the time of execution of loans, copies of all documents signed by the borrower and at any time thereafter, on a borrower's request, copies of all documents signed or delivered by the borrower and at any time, on request, a copy of the institution's articles of incorporation or charter and bylaws.

10. SEC. 4.14. RECONSIDERATION OF ACTION ON LOAN APPLICATION.—The Board of directors of each Farm Credit System institution shall establish one or more credit review committee(s), which shall include farmer board representation. Any loan applicant who has received written notice, under section 4.13, of a decision to deny or reduce the loan applied for, if the applicant so requests in writing within thirty days after receiving such notice, may obtain a review of such decision in person before the credit review committee. When a loan applicant requests review of an adverse credit decision, a majority of persons serving on such review committees must be persons who were not involved in making the adverse decision. Promptly after any such review, the applicant shall be notified in writing of the credit review committee's decision and the reasons therefor.

view mechanism.[11]

By 1987, Congress had determined that it simply could not rely on the Farm Credit System to initiate and operate a program and to promulgate regulations to implement that program giving meaningful relief to distressed farmer-borrowers.[12]

## G. *Alternate Remedies*

The majority adopts the view of the *Harper* court that Congress has armed the Farm Credit System with a variety of administrative remedies to assure compliance with the borrowers' rights provisions of the Agricultural Credit Act of 1987. Also, by entrusting the Farm Credit Administration (FCA) in the first instance with enforcement of the Act, according to *Harper*, Congress provided a mechanism that fosters consistency in interpretation and application and minimizes the potential expense and delay of numerous private court challenges to the conduct of institutions within the System.

The plain fact, however, is that the FCA is in no position to effectively enforce the borrowers' rights provisions of the 1987 Act. The farm borrowers have no way to invoke the remedial powers of the FCA. There is no procedure for filing charges or complaints. As the Supreme Court noted

in *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979),

[The Supreme Court] has never withheld a private remedy where the statute explicitly confers a benefit on a class of persons and where it does not assure those persons the ability to activate and participate in the administrative process contemplated by the statute.

*Id.* at 706 n. 41, 99 S.Ct. at 1963 n. 41. There is no such assurance here.[13]

Moreover, this record does not support the view that the FCA has either the ability or willingness to enforce the borrowers' rights provisions. The FCA has viewed its primary responsibility as one of examining the institutions in the System for financial condition, quality of management, soundness, and compliance with laws and regulations. During 1987, the FCA took only 24 enforcement actions, none of which sought compliance with the borrowers' rights provisions of the 1987 Act.

Finally, even if the FCA with its limited resources wanted to enforce the borrowers' rights provisions of the Act, its authority to issue temporary cease-and-desist orders is unavailable because such orders can be issued only if the lender's violation

---

**11.** SEC. 307. Each local lending institution of the Farm Credit System established under the Farm Credit Act of 1971 (12 U.S.C. § 2001 et seq.) shall—

(1) review each loan that has been placed in nonaccrual status by such institution to determine whether such loan may be restructured based on changes in the circumstances of such institution as the result of this Act and the amendments made by this Act; and

(2) notify in writing the borrower of each such loan of the provisions of this section.

**12.** Representative Jones of Tennessee, in bringing H.R. 3030 from committee to the floor of the House, stated:

In summary I want to let the system and FCA know that together they destroyed the integrity of the 1985 Farm Credit Act and necessitated this year's legislation. The Congress cannot tolerate such irresponsible action again and we expect the system and its regulator to diligently undertake their respective responsibilities and to cooperate in those matters that are necessary to ensure that full advantage is taken of the provisions of the new law.

133 Cong.Rec. H11869, H11873 (Dec. 18, 1987).

**13.** In *Karahalios v. Federal Employees,* 489 U.S. 527, 109 S.Ct. 1282, 103 L.Ed.2d 539 (1989), the Supreme Court held that Title VII of the Civil Service Reform Act of 1978 (CSRA) did not imply a right of action because of the presence of an administrative remedy.

These guideposts indicate that the Court of Appeals was quite correct in concluding that neither the language nor the structure of the Act shows any congressional intent to provide a private cause of action to enforce federal employees unions' duty of fair representation. That duty is expressly recognized in the Act, and an administrative remedy for its breach is expressly provided for before the FLRA, a body created by Congress to enforce the duties imposed on agencies and unions by Title VII, including the duty of fair representation. Nothing in the legislative history of Title VII has been called to our attention indicating that Congress contemplated direct judicial enforcement of the union's duty.

*Id.* at ——, 109 S.Ct. at 1287, 103 L.Ed.2d at 547. Unlike Title VII of the CSRA, the Agricultural Credit Act of 1987 provides no effective administrative remedy.

is likely to cause insolvency or substantial dissipation of assets or earnings of the institution or otherwise seriously prejudice the interests of the investors in Farm Credit System obligations or shareholders in the institution.

12 U.S.C. § 2262(a). Similarly, its authority to suspend or remove officers extends only to those situations involving substantial financial loss, impairment of shareholder interests, or personal dishonesty. 12 U.S.C. § 2264(a).

In sum, borrowers are, as a practical matter, unable to enforce their rights through administrative avenues.

## II. ANTI–INJUNCTION ACT

The district court held that the Zajacs' request for injunctive relief violated the Anti–Injunction Act. The Zajacs disagree, arguing that this case falls squarely in the "expressly authorized" exception to the Anti–Injunction Act. The test to determine whether a federal statute expressly authorizes an injunction against state court proceedings "is whether an Act of Congress, clearly creating a federal right or remedy enforceable in a federal court of equity, could be given its intended scope *only* by the stay of a state court proceeding." *Mitchum v. Foster*, 407 U.S. 225, 238, 92 S.Ct. 2151, 2160, 32 L.Ed.2d 705 (1972) (emphasis added). Moreover, the federal statute in question need not make specific reference to either the Anti–Injunction Act or an injunction of state court proceedings.

*Id.* at 237, 92 S.Ct. at 2159; *Amalgamated Clothing Workers of America v. Richman Bros. Co.*, 348 U.S. 511, 516, 75 S.Ct. 452, 455, 99 L.Ed. 600 (1955).

First, the Federal Land Banks were created by Congress in 1916 as "instrumentalities of the United States." 12 U.S.C. § 2011. Indeed, the entire Farm Credit System itself is uniquely federal because it is created by and exists at the pleasure of the Congress. Also, systemwide requirements of the Agricultural Credit Act of 1987, such as restructuring, are not only uniquely federal; such provisions are absolutely federal.

Second, the congressional purpose underlying the Act will be completely defeated if the Zajacs are not granted injunctive relief to stop the state foreclosure process. Both the House and the Senate were concerned about the System lenders' past abuses of state court foreclosure proceedings.[14] Congress therefore enacted the Act to preclude the institution or continuation of a state court foreclosure proceeding until the lender considers restructuring. By temporarily stopping the continuation of a foreclosure proceeding, the Act encompasses the use of injunctions by a federal court to prevent state court foreclosure proceedings in violation of the Act.

The Act, together with its legislative history, establishes congressional authorization so that the 1987 Act falls squarely within the "expressly authorized" excep-

---

**14.** In this case, the Bank used state court foreclosure proceedings once the Zajacs could not meet their financial obligations. By enacting the 1987 Act, Congress attempted to require System lenders to evaluate the economics of restructuring before resorting to the drastic remedy of foreclosure. When introducing one of the Senate bills, Senator Pryor explained:

The Farm Credit System was established to ensure the existence of a viable source of credit on reasonable terms for farmers at times when the market will not provide such credit. The Farm Credit System's historical mission has been to strengthen participation in agriculture, by broadening the availability of credit to borrowers.... Unfortunately, during the crises of the past few years the managers of the Farm Credit System seem to have forgotten whom their cooperative was established to serve. In many parts of the

country the Farm Credit System looked to foreclosure as a first resort rather than a last resort.... The bill that we introduce today is aimed at reestablishing Farm Credit System policies that will help farmers in need of help and at preserving local control of the Farm Credit System.

S. 1156, 100th Cong., 1st Sess., 133 Cong.Rec. 6102–03 (May 6, 1987).

Senator Melcher, upon introduction of the second Senate bill, stated:

Before this crisis becomes a disaster, Mr. President, we must do something to lift this crushing burden from the back of rural America. We must get system interest rates down and stop the wholesale foreclosure and forced liquidation of family farms and ranches.

S. 1665, 100th Cong. 1st Sess., 133 Cong.Rec. 11725 (Aug. 7, 1987).

tion to the Anti–Injunction Act. Thus, the Anti–Injunction Act does not bar injunctive relief in this instance.

## CONCLUSION

Farm borrowers have a private right of action to enforce the borrowers' rights provisions of the Act, one of which requires that, on review, an independent appraiser be named at the request of the farmer-borrower.[15] I would go no further than that in this case.[16] I do not suggest that, if the borrowers' rights provisions are followed and the credit review committee still decides to deny the request to restructure, the reasonableness of that decision will be reviewed. It would not be appropriate for a federal court to intrude into credit decisions of a System lender if the lender complies with the statutorily mandated procedures. My view is that Congress enacted the Act in the belief that System lenders would act wisely if they complied with such procedures. With respect to the procedure at issue here, Congress wanted to ensure that there was an independent appraisal in the record so that the farmer-borrower could effectively argue his case before the credit review committee and that the committee would base its decision on all relevant information. It is inappropriate for us to refuse to enforce this specific procedure.

As a final argument, the Bank asserts that its failure to grant the Zajacs' request for an independent appraisal is plainly harmless under the circumstances of this case. The Bank's assertion may well be true, but this argument fails to recognize the limited scope of the rights granted to borrowers by Congress and, consequently, the limited scope of the remedies available in federal courts pursuant to the Act. By asking this Court to evaluate the harmlessness of the Bank's decision, the Bank seeks an evaluation of the credit review committee's decision to foreclose as reasonable in light of an independent appraisal prepared by the Zajacs. This sort of question—whether a credit review committee's decision is reasonable—is a type of judicial inquiry clearly not authorized by the Act or desired by Congress. This Court can enforce only those specific procedures granted to protect borrowers.

I would therefore remand this matter to the district court with directions to enjoin the Bank from foreclosing on the property in question until such time as the Bank complies with the mandated procedures found in the borrowers' rights provisions of the Act.

---

**15.** In *Harper*, the Ninth Circuit in applying *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975), apparently concluded the 1987 Act was not enacted for the "especial" benefit of farmer-borrowers. 878 F.2d at 1174–75. I disagree. There can be no doubt that farmer-borrowers are a protected class under the Act because its language and structure established broad rights for borrowers and mandatory duties for lenders. A private cause of action will be readily found "where the language of the statute explicitly confer[s] a right directly on a class of persons that include[s] the plaintiff." *Universities Research Ass'n v. Coutu*, 450 U.S. 754, 771, 101 S.Ct. 1451, 1462, 67 L.Ed.2d 662 (1981), (quoting *Cannon v. University of Chicago*, 441 U.S. 677, 690 n. 13, 99 S.Ct. 1946, 1954 n. 13, 60 L.Ed.2d 560 (1979)); *Miener v. State of Mo.*, 673 F.2d 969, 974 n. 4 (8th Cir.1982).

Certainly, Congress drafted the 1987 Act with an "unmistakable focus on the benefited class:" farmer-borrowers. *Cannon*, 441 U.S. at 691, 99 S.Ct. at 1955; *Hofbauer v. Northwestern Nat'l Bank of Rochester*, 700 F.2d 1197, 1200 (8th Cir.1983). This is not a case where the provisions in question were primarily concerned with lenders rather than borrowers. *Hofbauer*, 700 F.2d at 1200. There is no better evidence of this "unmistakable focus" than the 1987 Act's grant only to borrowers of the power to initiate the procedures enacted within the "borrowers' rights" provisions of the Act. Moreover, to conclude otherwise ignores the Federal Credit System's creation specifically to provide capital for farmers.

**16.** Such a rule will not result in costly litigation for System lenders. Enforceable rights of borrowers are limited, requiring only specific injunctive relief. There will be the need for only limited discovery and pleadings. Moreover, I would not hold that damages are available. Ultimately, if the System lenders follow the narrowly prescribed rules set forth in the Act, this Court will not permit an action to proceed into the merits of the System lender's decision to foreclose rather than to restructure.