March 9, 1993
UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 91-1053

CASA MARIE, INC., ET AL.,

Plaintiffs, Appellees,

v.

SUPERIOR COURT OF PUERTO RICO FOR THE
DISTRICT OF ARECIBO, ET AL.,

Defendants, Appellants.

No. 91-1054

CASA MARIE, INC., ET AL.,

Plaintiffs, Appellees,

v.

SUPERIOR COURT OF PUERTO RICO FOR THE
DISTRICT OF ARECIBO, ET AL.,

Defendants, Appellees,

ESTHER RIVERA SANTOS, ET AL.,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Jose Antonio Fust , U.S. District Judge]

Before

Breyer, Chief Judge,

Feinberg,* Senior Circuit Judge,

and Cyr, Circuit Judge.

Anabelle Rodriguez Rodriguez, Deputy Solicitor General, with whom

Jorge E. Perez Diaz, Solicitor General, was on brief for appellant

Superior Court of Puerto Rico for the District of Arecibo.
Ramon L. Walker Merino with whom Angel M. Bonnet Rosario was on

brief for appellants Rivera Santos, et al.
William Ramirez-Hernandez with whom Nora Vargas-Acosta was on

brief for plaintiffs, appellees.
Carlos E. Vega-Perez with whom Juan Francisco Correa-Luna, Puerto

Rico Legal Services Corp., Kim Savage, Jeanne Finberg and National

Senior Citizens Law Center were on brief for intervenors-appellees.

March 9, 1993

*Of the Second Circuit, sitting by designation.

CYR, Circuit Judge. Appellants, neighbors in the Jardines
CYR, Circuit Judge.

de Arecibo housing development ("JDA") in Arecibo, Puerto Rico (-

"neighbors"), and the Superior Court of Puerto Rico for the District

of Arecibo ("Superior Court"), appeal from an order of the United

States District Court for the District of Puerto Rico permanently

enjoining enforcement of a final judgment of the Superior Court

mandating the immediate closure of Casa Marie, Hogar Geriatrico, Inc.

("Casa Marie"), a live-in, elder-care facility located in the JDA.

The Superior Court judgment was based on a determination that Casa

Marie was operating in violation of local zoning ordinances and JDA

restrictive covenants. Appellees, the owners and operators of Casa

Marie, and fourteen of its elderly and handicapped residents, insti-

tuted the federal action to enjoin enforcement of the Superior Court

judgment. The federal district court ruled that the neighbors' resort

to the Commonwealth courts to close Casa Marie violated the federally

protected rights of Casa Marie residents under 42 U.S.C. 1983

("section 1983") and the Fair Housing Act, 42 U.S.C. 3604 ("Title

VIII" or "FHA").

I

BACKGROUND

A. The Opening and Expansion of Casa Marie.
A. The Opening and Expansion of Casa Marie

The Jardines de Arecibo housing development was established

in 1967. Each property in the development is subject to restrictive

3

covenants allowing only detached single-family residences, prohibiting

uses or offensive activities constituting a "nuisance," and requiring

prior approval of all construction and alterations. On April 25,

1986, Casa Marie, a live-in facility for elderly handicapped persons,

was established by Maria Pla Placencio on a dead-end street in a

section of JDA zoned residential (R-3). The R-3 zoning classification

allows one and two-family residences, rowhouses, or apartment build-

ings; elder-care facilities are not allowed except as a variance.

On May 7, 1986, Casa Marie applied to the Department of

Social Services ("DSS") for a license to operate an elder-care facili-

ty in two single-family residences located on adjacent Lots 19 and 20.

The minimum DSS licensure requirements included endorsements from the

fire, police, and health departments,1 and a valid variance permit

from the Administracion de Reglamentos y Permisos ("A.R.P.E."), the

agency authorized to oversee and administer local zoning laws. On

May 21, 1986, A.R.P.E. granted Casa Marie a variance permit, and on

February 4, 1987, Casa Marie was granted a six-month provisional DSS

license to operate an elder-care facility on Lots 19 and 20, pending

full compliance with all other licensing requirements. When its

provisional DSS license lapsed in August 1987, Casa Marie was denied a

permanent DSS license due in part to the discovery that the A.R.P.E.

1As these endorsements were not seriously at issue, either in the
Commonwealth courts or the federal court, we do not address them on
appeal.

4

variance permit might be applicable to Lot 19 only. DSS nevertheless

allowed Casa Marie to continue to operate under DSS supervision.

During 1987, the Casa Marie owners began to expand opera-

tions, incorporating a third single-family residence, on Lot 21, by

constructing wheelchair ramps connecting the buildings on Lots 19, 20

and 21.2 The owners did not seek or secure the required A.R.P.E.

construction permits for these renovations. On January 21, 1988,

several Casa Marie neighbors filed an administrative complaint with

A.R.P.E., pursuant to P.R. Laws Ann. tit. 23, 71x, 72 (1987),3

requesting that A.R.P.E. order Casa Marie to cease all construction

and that A.R.P.E. institute judicial action to compel Casa Marie to

demolish the unauthorized structures.

B. The Superior Court Judgment and Appeal.

2By December 1987, the resident population of Casa Marie had increased
from two to twenty-six.

3Section 71x authorizes A.R.P.E. to issue orders to "cease and desist
so that necessary preventative or control measures [can] be taken to
achieve the purposes of this chapter . . . ." P.R. Laws Ann. tit. 23,
71x (1987). Section 72 provides, in pertinent part:

The Administrator or the Secretary of Justice in those cases
where he is requested to do so in behalf of the People of
Puerto Rico, or any owner or occupant of any neighboring
property who is or may be particularly harmed by any such
violations may, in addition to the other remedies provided
by law, institute injunctions, mandamus or abatement pro-
ceedings or other appropriate action to prevent, enjoin,
abate, vacate, remove or demolish any building erected or
any building or use made or maintained . . . in violation of
this chapter . . . .

Id. 72.

5

On April 18, 1988, while their administrative action was

pending before A.R.P.E., the neighbors filed a complaint in the

Superior Court against Casa Marie and its owners, alleging violations

of the zoning ordinances and the JDA restrictive covenants. The

neighbors requested injunctive relief requiring demolition of the

inter-building renovations and a cessation of all operations. The

A.R.P.E. and Superior Court actions were consolidated in the Superior

Court.4

In May 1988, in order to remedy its zoning violations, Casa

Marie submitted a proposal to A.R.P.E. whereby Lots 19, 20 and 21

would be "grouped" into one property for zoning purposes.

On July 14, 1988, however, the Superior Court entered

judgment against Casa Marie, finding, inter alia, that

(1) Casa Marie violated local zoning laws by its fail-
ure to obtain a valid variance permit for Lot 21, and
valid construction permits for the renovations on Lots
19, 20 and 21;

(2) Casa Marie was engaged in a "commercial-
institutional" use, not a "residential use" as required
by the covenants;

(3) Increased levels of traffic and noise in the neigh-
borhood, and the neighbors' fears of "disturbing" the
elderly residents, whom they considered "strangers in
the neighborhood," had "creat[ed] a dislocation or
disorder in the lifestyle of the residential area"
which constituted a "nuisance" under the restrictive
covenants;

4A.R.P.E. issued a "cease and desist" order on May 31, 1988, prevent-
ing further renovations, but refrained from directing demolition.

6

(4) Certain businesses located in JDA's R-3 zone for
example, a medical office and a day-care nursery
also violated the restrictive covenants, but those
violations were insufficient to extinguish the cove-
nants under the equitable doctrine of "changed circum-
stances"; and

(5) Even if A.R.P.E. were to permit a variance for Casa
Marie in the future, thereby excusing its past zoning
violations, A.R.P.E. was without authority under Puerto
Rico law to supersede or excuse Casa Marie's coincident
violations of the restrictive covenants.

The Superior Court ordered immediate cessation of the unauthorized

operations at Casa Marie, demolition of the unauthorized renovations

within four months, and notification of the closure of the elder-care

facility to all Casa Marie residents.

Upon notification of the Superior Court judgment, A.R.P.E.

suspended action on the Casa Marie "lot grouping" proposal. Without

an A.R.P.E. permit, Casa Marie was ineligible for a permanent DSS

operating license.

On September 9, 1989, in their appeal of the Superior Court

judgment to the Supreme Court of Puerto Rico, the Casa Marie owners

alleged, for the first time, that the neighbors had discriminated

against Casa Marie's handicapped residents under the Puerto Rico Bill

of Rights for Aged Persons. See P.R. Laws Ann. tit. 8, 341-347,

343(b) (1987) ("All aged persons shall be entitled to . . . live in a

dignified environment that satisfies their basic housing . . . needs";

authorizing aged persons to bring a "priority" private cause of action

7

in Commonwealth courts). The Supreme Court of Puerto Rico affirmed

the Superior Court judgment in November 1989.5

5Casa Marie filed a motion to set aside the judgment, which the
Superior Court denied on March 28, 1990.

8

C. The Enforcement and Contempt Proceedings.

Casa Marie continued to operate. The neighbors requested a

hearing to compel compliance with the Superior Court judgment. At the

Superior Court hearing on August 15, 1990, the Casa Marie owners

unsuccessfully attempted to interpose Title VIII claims, presumably in

behalf of the residents. On October 2, 1990, Legal Services Corpora-

tion ("Legal Services") filed a motion to intervene in the Superior

Court enforcement proceedings in behalf of five Casa Marie residents

("intervenors"). At the same time, Legal Services brought an indepen-

dent action in behalf of the intervenors, asserting claims under

section 3604 of the FHA,6 the Puerto Rico Bill of Rights for Aged

6Section 3604(f)(1) of Title VIII makes it unlawful

[t]o discriminate in the sale or rental, or to otherwise

make unavailable or deny, a dwelling to any buyer or renter

because of a handicap of

(A) that buyer or renter,
(B) a person residing in or intending to reside in
that dwelling after it is so sold, rented, or made
available; or
(C) any person associated with that buyer or renter.

42 U.S.C. 3604(f)(1) (emphasis added).
Section 3617 further provides that

[i]t shall be unlawful to coerce, intimidate, threaten, or
interfere with any person in the exercise or enjoyment of,
or on account of his having exercised or enjoyed, or on
account of his having aided or encouraged any other person
in the exercise or enjoyment of, any right granted or pro-
tected by [sections 3603, 3604, 3605, or 3606].

42 U.S.C. 3617.
Plaintiffs appear to have stated a prima facie case under Title

VIII. See Trafficante v. Metropolitan Life Ins. Co., 409 U.S. 205,

211-12 (1972) (FHA broadly construed to effectuate its remedial

9

Persons, and 42 U.S.C. 1983. The intervenors' section 1983 claims

alleged that the Superior Court had acted in concert with the neigh-

bors to deprive Casa Marie residents of their civil rights under the

Constitution and laws of the United States.

purpose to foster "truly integrated and balanced living patterns")
(quoting 114 Cong. Rec. 3422 (1968)). Title VIII may afford protec-
tion to elderly persons who are, or are perceived as, "persons of a
handicap." See 42 U.S.C. 3602(h) (defining "handicap" as: (1) "a

physical or mental impairment which substantially limits one or more
of [a] person's major life activities," (2) "a record of having such
an impairment," or (3) "being regarded as having such an impairment").
Title VIII may proscribe discriminatory acts by persons who are
neither sellers nor lessors of property. See Edwards v. Johnson

County Health Dep't, 885 F.2d 1215, 1221 n.14 (4th Cir. 1989); Evans

v. Tubbe, 657 F.2d 661, 663 (5th Cir. 1981). The phrase "otherwise

make unavailable or deny" encompasses a wide array of housing practic-
es, see, e.g., South-Suburban Hous. Ctr. v. Greater South-Suburban Bd.

of Realtors, 935 F.2d 868, 882 (7th Cir. 1991), cert. denied, 112 S.

Ct. 971 (1992), and specifically targets the discriminatory use of
zoning laws and restrictive covenants. See H.R. Rep. No. 711, 2d

Cong., 22 (1988) ("Act is intended to prohibit the application of
special requirements through land use regulations [and] restrictive
covenants . . . ."); see also Huntington Branch, NAACP v. Town of

Huntington, 844 F.2d 933, 935 (2d Cir. 1988); Rhodes v. Palmetto

Pathway Homes, Inc., 400 S.E.2d 484, 486 (S.C. 1991). Finally, Casa

Marie may qualify as a "dwelling." See 42 U.S.C. 3602(b) ("dwell-

ing" defined as "any building, structure, or portion thereof which is
occupied as, or designed or intended for occupancy as, a residence by
one or more families, and any vacant land which is offered for sale or
lease for the construction or location thereon of any such building,
structure, or portion thereof"); id. 3602(c) ("family" may mean a

"single individual"); United States v. Columbus Country Club, 915 F.2d

877, 881 (3d Cir. 1990) (defining FHA "residence" as "'a temporary or
permanent dwelling place, abode or habitation to which one intends to
return as distinguished from the place of temporary sojourn or tran-
sient visit'") (citation omitted), cert. denied, 111 S. Ct. 2797

(1991); but cf. 42 U.S.C. 3607(b)(1) (providing that "[n]othing in

this title limits the applicability of any reasonable local, State, or
Federal restrictions regarding the maximum number of occupants permit-
ted to occupy a dwelling"); Elliott v. City of Athens, Georgia, 1992

U.S. App. LEXIS (11th Cir. May 19, 1992).

10

On October 9, 1990, the Superior Court issued a civil

contempt decree in the neighbors' enforcement proceedings, ordering

the arrest and imprisonment of Casa Marie's owners in the event they

failed to comply with its final judgment by November 5, 1990.

On October 23, a different Superior Court judge allegedly

expressed ("off the record") reluctance to address intervenors'

belated initiatives to stave off the contempt proceedings against Casa

Marie for refusing to comply with the Superior Court's final judgment

mandating closure. Nevertheless, no order was entered disposing of the

motion to intervene or the newly filed Superior Court lawsuit.

D. The Federal District Court Action.

Three days later, on October 26, a complaint was filed in

the federal district court by Casa Marie, its owners, and nine other

residents (hereinafter "nonintervenors"). The complaint alleged that

the neighbors and the Superior Court had acted in concert to enforce

the zoning ordinances and the JDA restrictive covenants in a dis-

criminatory manner in violation of the Equal Protection Clause of

the United States Constitution, and Title VIII in order to deprive

the elderly handicapped residents of their right to live in an inte-

grated community. The complaint requested injunctive relief, compen-

satory and punitive damages, and attorney fees.

The district court allowed Legal Services and the five

would-be Superior Court intervenors to intervene in the federal court

action. After a four-day hearing, the district court determined that

11

the neighbors had violated section 1983 and FHA sections 3604(f) and

3617 by resorting to the courts of the Commonwealth to enforce the

relevant zoning ordinances and restrictive covenants as a means of

effecting a discriminatory eviction of the elderly handicapped Casa

Marie residents from the neighborhood. See Casa Marie v. Superior

Court of Puerto Rico for District of Arecibo, 752 F. Supp. 1152, 1167-

69 (D.P.R. 1990). The district court permanently enjoined the neigh-

bors from executing their Superior Court judgment and the Superior

Court contempt decree. The neighbors and the Superior Court appealed.

II

DISCUSSION

The neighbors advance three contentions on appeal: first,

the district court improperly rejected their affirmative defenses

based on res judicata, collateral estoppel and the statute of limita-

tions; second, appellees failed to sustain their burden of proof on

the section 1983 and Title VIII claims; and third, under the Anti-

Injunction Act and the Younger abstention doctrine, the district court

improperly enjoined the pending Superior Court enforcement and con-

tempt proceedings. We need not confront the entire panoply of appel-

lants' arguments, however, as we conclude that (1) appellees' section

1983 claims should have been dismissed, and (2) their Title VIII

claims should not have been entertained by the district court since

the pending Superior Court proceedings would afford plaintiffs an

adequate forum.

12

13

A. The Section 1983 Claims.

The neighbors contend on appeal that the residents failed to

establish an essential element of their section 1983 claims; namely

that the neighbors acted "under color of state law" by resorting to

the Commonwealth courts to enforce the restrictive covenants against

Casa Marie. Relying on Shelley v. Kraemer, 334 U.S. 1 (1948), the

district court concluded that the neighbors' resort to the Common-

wealth judicial system to enforce the JDA restrictive covenants in a

discriminatory manner met the "state action" requirement under section

1983. Casa Marie, 752 F. Supp. at 1166.

There are two components to the "state action" requirement:

First, the deprivation must be caused by the exer-
cise of some right or privilege created by the
State or by a rule of conduct imposed by the State
or by a person for whom the State is responsible .
. . . Second, the party charged with the depriva-
tion must be a person who may fairly be said to be
a state actor. This may be because he is a state
official, because he has acted together with or
has obtained significant aid from state officials,
or because his conduct is otherwise chargeable to
the State.

Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982); United States v.

Price, 383 U.S. 787, 794 (1966) ("Private persons, jointly engaged

with state officials in the prohibited action, are acting 'under

color' of law for purposes of [section 1983]. To act 'under color' of

law does not require that the accused be an officer of the State. It

is enough that he is a willful participant in joint activity with the

State or its agents."). It is obvious, nonetheless, that something

14

more than mere resort to a state court is required to transform the

moving party into "a co-conspirator or a joint actor with the judge."

Dennis v. Sparks, 449 U.S. 24, 28 (1980); see also Lugar, 457 U.S. at

937; McDougald v. Jenson, 786 F.2d 1465, 1488-89 (11th Cir.), cert.

denied, 479 U.S. 860 (1986). Appellees advance two grounds for

finding the requisite "state action" in the present case.7

1. Corruption, Conspiracy, Usurpation, or Collusion.

An actual conspiracy between a state court and a party

attempting a plainly prohibited act would constitute "state action."

Cf. Adickes v. S.H. Kress & Co., 398 U.S. 144, 150-52 (1970). The

residents contend that the Superior Court judge improperly abandoned

his judicial role by permitting the neighbors to draft the final

judgment against Casa Marie, contrary to the normal practice in

Commonwealth courts. The neighbors counter that they merely tran-

scribed the court's ore tenus ruling at its request. As the district

court made no findings of fact on the residents' conspiracy allega-

tion, and no uncontroverted record evidence supports it, we decline to

credit their conclusory allegation as a sufficient basis for finding

"state action" in these circumstances. See, e.g., Schucker v. Rock-

7The "state action" requirement may be met where (1) a sufficient
financial or regulatory nexus exists between the private party and the
state entity; (2) the private party has been delegated authority to
conduct a public function traditionally within the exclusive preroga-
tive of the State; or (3) the private party and the state entity share
a symbiotic, interdependent relationship. See Rodriguez-Garcia v.

Davila, 904 F.2d 90, 96-99 (1st Cir. 1990). These grounds are neither

suggested nor established in the present record.

15

wood, 846 F.2d 1202, 1205 (9th Cir.) (conclusory allegations of

conspiracy between court and litigants insufficient to establish

"state action"), cert. denied, 488 U.S. 995 (1988).

2. Neutrality and the Use of Courts
to Enforce Restrictive Covenants.

The residents argue, in the alternative, that Shelley v.

Kraemer, 334 U.S. 1 (1948), supports the district court's "state

action" determination. In Shelley, the Supreme Court found "state

action" where private parties resorted to the state courts to enforce

a facially discriminatory restrictive covenant which provided, inter

alia, that "no part of said property . . . shall be, for said term of

Fifty-years, occupied by any person not of the Caucasian race, it

being intended hereby to restrict the use of said property . . .

against the occupancy as owners or tenants of any portion of said

property for resident or another purpose by people of the Negro or

Mongolian Race." Id. at 4. The residents insist that Shelley like-

wise encompasses judicial action to enforce a facially neutral

covenant in a discriminatory manner.

Two decades ago, this court propounded a clear limiting

principle for applying the "state action" standard enunciated in

Shelley. See Lavoie v. Bigwood, 457 F.2d 7, 11-12 (1st Cir. 1972).

Distinguishing Shelley from Griffin v. Maryland, 378 U.S. 130 (1964),

Judge Coffin aptly noted:

In [Griffin,] a deputy sheriff had ordered certain

black patrons to leave a privately-owned amusement

16

park, had arrested them when they refused to do
so, and had brought a prosecution for criminal
trespass. The Court recounted Maryland's argument
that it

may . . . constitutionally enforce an owner's
desire to exclude particular persons from his
premises even if the owner's desire is in
turn motivated by a discriminatory purpose.
The State, it is said, is not really enforc-
ing a policy of segregation since the owner's
ultimate purpose is immaterial to the State.
. . .

The Court responded that such were not the
facts of the case before it, in that "The presi-
dent of the corporation which owned and managed
the park testified that he had instructed [the
deputy sheriff] to enforce the park's policy of
racial segregation." A state, then, must be more
strictly neutral than to permit any of its offi-
cers to identify the subjects of the discrimina-
tion in the first instance. Although it was not
cited in Griffin, we take Shelley to be an earlier

application of the same principle. To enforce the
covenant and thereby disrupt a transaction between
a willing seller and a willing buyer, the state
court had necessarily to take evidence that the
prospective buyer was black and to take notice
that the clause being enforced was a racially
restrictive one.

But while, on the facts of Shelley and Grif-

fin, the Court had no occasion to announce a nar-

rower theory indicating when a state police offi-
cer or court is "neutral" for the purposes of the
Fourteenth Amendment, we think that, apart from
cases involving racial discrimination, Maryland's
argument suggests a workable theory. That is, a

state may at the behest of private persons apply

sanctions pursuant to general rules of law which

have discriminatory as well as non-discriminatory

application if it does not accept the responsibil-

ity of employing a discriminatory classification.

Such responsibility would exist when, in resorting

to a state sanction, a private party must neces-

sarily make the state privy to his discriminatory

purpose. Similarly, in such a case as this, the

state would retain a neutral posture unless it was

17

necessarily apprised of the landlord's purpose to

violate rights of free speech and association.

While not entirely satisfactory, this approach at
least recognizes conscious state involvement with-
out insisting upon an unattainable purity.

Lavoie, 457 F.2d at 11-12 (emphasis added) (citations omitted).

The residents have not established "state action" under the

Lavoie "neutrality" principle. The zoning ordinances and the restric-

tive covenants are facially neutral, and presumptively valid under

Puerto Rico law. Furthermore, the Casa Marie residents were not

parties to the Superior Court action prior to the entry of the final

judgment. Thus, it cannot be determined on any evidentiary basis that

the Superior Court was either apprised of any discriminatory animus on

the part of the neighbors, or asked to consider any discriminatory

effect that the belatedly alleged selective enforcement of the zoning

ordinances and restrictive covenants might occasion. Without indulg-

ing conjecture, therefore, it cannot be concluded that the Superior

Court must necessarily have been made privy to any allegedly discrimi-

natory design on the part of the neighbors. See id. at 12. Absent

"state action," the district court should have dismissed the section

1983 claims as a basis for injunctive relief, and the Superior Court

as a party-defendant.

18

B. The Fair Housing Act Claims.

1. Casa Marie and the Intervenors.

Unlike the nonintervenors, these federal plaintiffs attempt-

ed to litigate their federal claims in the district court, not-

withstanding their continuing involvement in two pending Superior

Court proceedings. In these circumstances, the district court should

have abstained in deference to the proceedings pending in the Superior

Court.

a. The Anti-Injunction Act.

The Anti-Injunction Act provides that "[a] court of the

United States may not grant an injunction to stay proceedings in a

State court except as expressly authorized by Act of Congress, or

where necessary in aid of its jurisdiction, or to protect or effectu-

ate its judgments." 28 U.S.C. 2283 (1990) (emphasis added).

Appellants challenge the district court ruling that Title VIII is an

"express" exception within the meaning of the Anti-Injunction Act.

See Casa Marie, 752 F. Supp. at 1169-71. Asserting that neither the

language of Title VIII, nor its legislative history, expressly autho-

rizes a federal court to enjoin a state court proceeding, appellants

argue that the Anti-Injunction Act constitutes an "absolute prohibi-

tion" on federal injunctive relief. See, e.g., Atlantic Coast Line R.

Co. v. Brotherhood of Locomotive Eng'rs, 398 U.S. 281, 297 (1970)

("Any doubts as to the propriety of a federal injunction . . . should

19

be resolved in favor of permitting the state courts to proceed . . .

.").8 We agree.

The Anti-Injunction Act is "an historical mechanism (Act of

March 2, 1793, 1 Stat. 334, 335) for achieving harmony in one phase of

our complicated federalism by avoiding needless friction between two

systems of courts having potential jurisdiction over the same subject-

matter." Hale v. Bimco Trading, Inc., 306 U.S. 375, 378 (1939). The

three exceptions enumerated in the Act must be narrowly construed.

See Mitchum v. Foster, 407 U.S. 225, 228-29 (1972); Atlantic Coast

Line, 398 U.S. at 298. While it is beyond dispute that the residents'

section 1983 claims come within an "express" exception to section

2283, see Mitchum, 407 U.S. at 240-41 (legislative history of section

1983 demonstrates obvious congressional distrust of state courts,

which were often "in league with those who were bent upon abrogation

of federally protected rights"), we are unable to discern any statu-

tory language or legislative history which indicates that Congress

expressly excepted Title VIII claims from the operation of the Anti-

Injunction Act.

8The Anti-Injunction Act bars federal court interference, whether by
direct or indirect methods, in the parties' "'utilization of the

results of a completed state proceeding.'" Gloucester Marine Rys.

Corp. v. Charles Parisi, Inc., 848 F.2d 12, 15 (1st Cir. 1988) (quot-

ing Atlantic Coast Line, 398 U.S. at 287). Unless it appears that

Title VIII constitutes an express authorization by Congress for
overriding the Anti-Injunction Act, the district court could not avoid
the needless federal-state court "friction" at the root of the Anti-
Injunction Act's prohibition simply by precluding enforcement of the
Superior Court judgment by enjoining the neighbors from executing
their judgment. Id.

20

In Mitchum v. Foster, 407 U.S. 225 (1972), the Supreme Court

prescribed a two-part analysis for determining whether a federal

statute comes within the Anti-Injunction Act's "expressly authorized"

exception: (1) the statute "must have created a specific and uniquely

federal right or remedy, enforceable in a federal court of equity,"

and (2) the federal right or remedy must be such that it can be "given

its intended scope only by the stay of a state court proceeding." Id.

at 237-38 (emphasis added). We need only consider the second prong of

the Mitchum test, but cf. infra note 16, which would seem to require

some indication that Congress suspected that state courts, as a

routine practice, would not vindicate Title VIII rights. See, e.g.,

Zajac v. Federal Land Bank, 909 F.2d 1181, 1195 (8th Cir. 1990)

(Agricultural Credit Act constitutes express exception, as it is aimed

at eradicating "past abuses of state court foreclosure proceedings.").

Congress contemplated concurrent state-federal court juris-

diction over Title VIII claims. See 42 U.S.C. 3613(a) (1)(A); cf.

General Motors Corp. v. Buha, 623 F.2d 455, 459 (6th Cir. 1980) (ERISA

is an "express" exception because of its preemption and exclusive

federal jurisdiction provisions); Dilworth v. Riner, 343 F.2d 226,

230-32 (5th Cir. 1965) (Title II of Civil Rights Act of 1964 consti-

tutes "express" exception, as it vests exclusive jurisdiction in

federal courts); Walling v. Black Diamond Coal Mining Co., 59 F. Supp.

348, 350 (D. Ky. 1943) (Fair Labor Standards Act constitutes "express"

exception; although jurisdiction is concurrent, injunctive relief is

available only in federal court). But see Total Plan Servs., Inc. v.

21

Texas Retailers' Ass'n, 925 F.2d 142, 145 (5th Cir. 1991) (ERISA not

"express" exception). Without more, the vesting of concurrent juris-

diction would seem to imply a vote of confidence in the integrity and

competence of state courts to adjudicate Title VIII claims. Signifi-

cantly, unlike the situation in Mitchum, appellees cite no legislative

history intimating that congressional mistrust of state courts figured

however slightly in the enactment of Title VIII.

Appellees instead argue that Congress implicitly demon-

strated mistrust of state and local government in general by enabling

private litigants to sue for federal injunctive relief against munici-

palities which enact or enforce zoning ordinances in a discriminatory

fashion. Their argument distends the Act's restrictive language

("expressly authorized by Act of Congress") to absurd limits. If

Mitchum's second prong were to be considered satisfied whenever

Congress enacted a statute authorizing injunctive relief, or by the

mere fact that a local government might be made a defendant in a

particular case, the rule requiring narrow construction of the Act's

exceptions would be rendered largely meaningless, and with it the

general presumption that state courts are competent to protect federal

rights. See Vendo Co. v. Lektro-Vend Corp., 433 U.S. 623, 636 (1977)

(listing twenty-six federal statutes authorizing injunctive relief,

and noting that such a blanket test would "eviscerate" the Anti-

Injunction Act as a meaningful restraint on federal courts). Accord-

ingly, we conclude that the Anti-Injunction Act barred federal injunc-

tive relief in favor of Casa Marie and the intervenors.

22

b. Younger Abstention.

Even assuming that Title VIII were to be considered an

express exception to the Anti-Injunction Act, appellants argue that

the district court should have abstained, in the interests of comity

and federalism, from interfering with pending state court proceedings

which implicate such vital state interests, see Younger v. Harris, 401

U.S. 37 (1971): namely, the Commonwealth's important stake in pro-

tecting the integrity of the contempt power as the ultimate means of

ensuring compliance with the final judgments of its courts, see

Juidice v. Vail, 430 U.S. 327 (1977), and of "vindicat[ing] [the

State's interest in] the regular operation of its judicial system,"

id. at 335. Again, we agree.

Proper respect for principles of federalism and comity

requires that federal courts, "anxious though [they] may be to vindi-

cate and protect federal rights and federal interests, always en-

deavor[] to do so in ways that will not unduly interfere with the

legitimate activities of the States." Younger, 401 U.S. at 44.

Except in the most extraordinary cases,9 a federal court must presume

9Extraordinary circumstances may be found, for example, where the
state statute or rule under which the federal plaintiff is prosecuted
or sued in state court is "flagrantly and patently violative of
express constitutional prohibitions in every clause," or where the
federal plaintiff demonstrates "'bad faith [prosecution], harassment
or any other unusual circumstances that would call for equitable
relief.'" Malachowski v. City of Keene, 787 F.2d 704, 708 (1st Cir.),

cert. denied, 479 U.S. 828 (1986); Landrigan v. City of Warwick, 628

F.2d 736, 743 (1st Cir. 1980). As we have noted, appellees presented
no evidence that the Superior Court acted in bad faith, or that the
zoning ordinances or restrictive covenants were patently discriminato-

23

that state courts, consistent with the imperatives of the Supremacy

Clause, see U.S. Const. art VI, are fully competent to adjudicate

federal constitutional and statutory claims properly presented by the

parties. See Middlesex County Ethics Comm. v. Garden State Bar Ass'n,

457 U.S. 423, 431 (1982); Bettencourt v. Board of Registration in

Medicine, 904 F.2d 772, 776 (1st Cir. 1990).10 To obtain federal

injunctive relief impeding a pending state court proceeding, there-

fore, the federal plaintiff must surpass the normal showing of irrepa-

rable injury, and posit the existence of an irremediable harm both

"great and immediate." Younger, 401 U.S. at 46. Even if it were

determined that plaintiffs successfully surmounted this heightened

standard of proof, however, it would be to no avail; the district

court failed to consider two paramount, countervailing factors: (1)

the importance of the State interest at stake in the pending Superior

Court proceedings, see, e.g., Pennzoil Co. v. Texaco, Inc., 481 U.S.

1, 5, 13 (1987) (abstention warranted where Texas' lien and bond

provisions, permitting writs of execution to issue prior to exhaustion

of state appeals, constitute an important process "by which the State

compels compliance with the judgments of its courts"); Trainor v.

Hernandez, 431 U.S. 434, 444 (1977) (abstention warranted where

ry. See Section II.A.

10As a normal consequence, Younger abstention forces the parties to a

state court proceeding to litigate federal claims and defenses through
the state court system, with discretionary appellate review by the
United States Supreme Court as a last resort. See Juidice, 430 U.S.

at 337, n.14; see also 28 U.S.C. 1257(2).

24

pending state court civil action brought by State of Illinois to

attach fraudulently obtained public assistance payments implicates

important state interest in "safeguarding the fiscal integrity of

[its] programs"); Huffman v. Pursue, Ltd., 420 U.S. 592, 604 (1975)

(abstention warranted where State's prosecution of civil nuisance suit

is analogous to its interest in criminal prosecution); Juidice, 430

U.S. at 335 (abstention warranted, as "[t]he contempt power lies at

the core of the administration of a State's judicial system"); Youn-

ger, 401 U.S. at 46 (abstention warranted in deference to pending

state criminal prosecution), and (2) the availability of an adequate

"opportunity" to raise the federal claims in the State court. See

Bettencourt, 904 F.2d at 777; Gabrilowitz v. Newman, 582 F.2d 100, 102

(1st Cir. 1978).

Given Casa Marie's undisputed disregard of the Superior

Court's final judgment, and the unquestioned importance of the Common-

wealth's interest in enforcing the judgments of its courts through

civil contempt proceedings, see Juidice, 430 U.S. at 335; see also

Pennzoil, 481 U.S. at 13 (State has important interest in preventing

its judgments from being "rendered nugatory"); cf. Lebbos v. Judges of

Superior Court, 883 F.2d 810, 814 (9th Cir. 1989), we hold that the

Younger doctrine barred Casa Marie and the intervenors from litigating

their Title VIII claims in federal district court. As a party to the

enforcement-contempt proceedings yet pending in the Superior Court,

Casa Marie not only had ample opportunity, but an obligation, to raise

its federal counterclaims in the Superior Court. See P.R. Laws tit.

25

32, App. III, R. 11.1 (a counterclaim is considered compulsory "if it

arises out of the transaction or occurrence that is the subject matter

of the opposing party's claim").

The intervenors belatedly sought to participate in the same

enforcement-contempt proceedings which remain pending in the Superior

Court, then instituted the Superior Court lawsuit whose sole purpose

is to restrain enforcement of the final Superior Court judgment and

contempt decree against the Casa Marie owners. Apart from their

unsubstantiated and conclusory allegation that a Superior Court judge

stated "off the record" that she might be disinclined to restrain

enforcement of a final judgment entered by a Superior Court colleague,

the intervenors neither alleged nor presented any evidence (e.g., an

order denying their motion to intervene or dismissing their complaint)

that they were precluded from pursuing either pending Superior Court

action. Instead, so far as the present record indicates, the inter-

venors simply suspended their pursuit of the Title VIII claims in the

pending Superior Court proceedings in favor of a fresh start in the

federal court action aimed at enjoining enforcement of the final

Superior Court judgment against Casa Marie.

We conclude that extraordinary injunctive relief indirectly

suspending enforcement of the Commonwealth's judicial processes in the

ongoing Superior Court proceedings, with its attendant depreciation of

the fundamental principles underlying federalism and comity, was

unwarranted. See Moore v. Sims, 442 U.S. 415, 426 (1979) (abstention

appropriate "unless state law clearly bars the interposition of

26

[federal] claims") (emphasis added). After initiating a state court

proceeding, a federal plaintiff cannot escape Younger's reach merely

by abandoning the pending state court action or foregoing available

state appellate remedies, New Orleans Pub. Serv., Inc. v. Council of

New Orleans, 491 U.S. 350, 369 (1989); the "opportunity" to raise

federal claims in a pending state court proceeding is enough to

implicate Younger abstention. Juidice, 430 U.S. at 337. Thus,

Younger abstention precluded the district court order indirectly

enjoining the pending Superior Court contempt proceedings against Casa

Marie and the intervenors.

2. The Nonintervenors.

The prudential considerations underlying the Anti-Injunction

Act and Younger abstention require further searching inquiry in

reference to the federal claims presented by the nonintervenors. The

majority of cases in which federal courts abstain from enjoining

pending state court proceedings involve federal plaintiffs who are

actual parties to the state court proceedings. The nonintervenors

were not involved in either pending Superior Court proceeding. As we

have noted, however, see supra Section II.B.1.a., the state and

federal courts possess concurrent jurisdiction under Title VIII, see

42 U.S.C. 3613(a) (1)(A), offering Title VIII plaintiffs a choice of

forum. Ultimately, therefore, the essential question becomes whether

the nonintervenors waived or acquiesced in a waiver of the right to

present their Title VIII claims in the federal forum.

27

a. The Anti-Injunction Act.

Under the "strangers to the state court proceedings" ex-

clusion,11 the Anti-Injunction Act is inoperative if the party re-

questing injunctive relief in the federal court was neither a party,

nor in privity with a party, to the state court proceeding sought to

be enjoined. See County of Imperial v. Munoz, 449 U.S. 54, 59-60

(1980); Hale v. Bimco Trading, Inc., 306 U.S. 375, 378 (1939); Chase

Nat'l Bank v. City of Norwalk, 291 U.S. 431, 440 (1934); Garcia v.

Bauza-Salas, 862 F.2d 905, 909 (1st Cir. 1988). The "strangers"

exclusion presumably embraces federal plaintiffs who deliberately

bypass an available opportunity to intercede in pending state court

proceedings, since "[t]he law does not impose upon any person abso-

lutely entitled to a hearing the burden of voluntary intervention in a

suit to which he is a stranger." Chase Nat'l Bank, 291 U.S. at

441.12 Neither Casa Marie nor the intervenors fit within the

11The district court did not mention the "strangers" exclusion as a
basis for its decision. Nevertheless, its conclusion that res judica-

ta did not bar their claims necessarily subsumed a determination that

the nonintervenors were "strangers."

12Generally speaking, intervention rules are permissive, while joinder
rules are mandatory. Thus, in order to preclude future relitigation
of claims arising out of the same transaction, a state court plaintiff
would need to join all those whom he intends to bind by the judgment
who are not in privity with the named defendants for res judicata

purposes. See Professional Hockey Club Cent. Sports Club of the Army

v. Detroit Red Wings, 787 F. Supp. 706, 717 (E.D. Mich. 1992) (federal

plaintiff's tactical decision not to waive personal jurisdiction in
state court should not preclude its employment of "strangers" exclu-
sion in subsequent federal action); cf. Martin v. Wilks, 490 U.S. 755,

761-65 (1989); see generally Charles A. Wright, Arthur Miller, &

Edward H. Cooper, Federal Practice & Procedure: Jurisdiction 4452,

at 439-453 (1981).

28

"strangers" exclusion, of course, but neither would their mere joinder

with nonintervenors as federal plaintiffs necessarily deprive the

nonintervenors of the exclusion. See generally Charles A. Wright,

Arthur Miller, & Edward H. Cooper, Federal Practice & Procedure:

Jurisdiction 4449, at 416 (1981) [hereinafter Federal Practice]

("The bare fact that one plaintiff is joined with others who were

parties and who can properly be bound by a prior proceeding does not

justify preclusion of the nonparty plaintiff as well.") (citing Duncan

v. Town of Blackburg, 364 F. Supp. 643, 645 (W.D. Va. 1973)). The

nonintervenors' status as "strangers" to these proceedings accordingly

depends on whether they are bound, under the principles of res judica-

ta or collateral estoppel, by the decisions in either pending Superior

Court proceeding. See, e.g., United States Steel Corp. Plan for

Employee Ins. Benefits v. Musisko, 885 F.2d 1170, 1179 (3d Cir. 1989),

cert. denied, 493 U.S. 1074 (1990); Pelfresne v. Village of Williams

Bay, 865 F.2d 877, 881 (7th Cir. 1989).

Although it is highly questionable whether either interve-

nors or nonintervenors would be "bound" under res judicata principles

by any judgment or contempt decree against the Casa Marie owners,13

13The only obvious connection between Casa Marie and its residents
the "landlord-tenant" relationship might not generate a sufficient
identity of interest, or privity, between the parties. As a general
rule, holders of concurrent interests in property, unlike successors
in interest, are not considered in privity for res judicata purposes.

Compare In re Corporacion de Servicios Medico-Hospitalarios, 98 B.R.

639 (Bankr. 1989) (nonparty in privity where nonparty is a successor
in interest or assignee of party to first action) with Federal Prac-

tice 4461, at 542, 543 n.3 (and cases cited therein).

29

the common interests asserted by the intervenors and nonintervenors

are virtually identical in all material respects. While we need not

rest our decision solely on this ground, see infra Section II.B.2.b.,

we are convinced that the Commonwealth courts would treat the interve-

nors, by reason of their initiation of the independent Superior Court

action to restrain enforcement of the contempt decree, as the "virtual

representatives" of the nonintervenors' interests for res judicata

purposes. See, e.g., In re Medomak Canning, 922 F.2d 895, 901 (1st

Cir. 1990); see also 28 U.S.C. 1738 (federal court must accord state

court judgment the same preclusive effect it would be given by the

courts of that State); Migra v. Warren City Sch. Dist. Bd. of Educ.,

465 U.S. 75, 81 (1984) (same); Rojas-Hernandez v. Puerto Rico Elec.

Power Auth., 925 F.2d 492, 495 (1st Cir. 1991) (same).14

We recognize, of course, that "it is not enough that [the

federal plaintiffs'] concerns . . . mirrored those which likely

impelled [the earlier plaintiffs] to start suit in superior court,"

14Puerto Rico's res judicata statute, P.R. Laws Ann. tit. 31, 3343,

provides: "[i]n order that the presumption of the res judicata may be
valid in another suit, it is necessary that, between the case decided
. . . and that in which the same is invoked, there be the most perfect

identity between the things, causes, and persons of the litigants, and

their capacity as such." (Emphasis added.); see also Future Dev.

Corp. v. Centex Corp., 761 F.2d 33, 43 (1st Cir.), cert. denied, 474

U.S. 850 (1985). "Perfect identity between persons," however, is not
as absolute a term as may at first appear. Section 3343 further
provides that "there is identity of persons whenever the litigants of
the second suit are legal representatives of those who litigated in

the preceding suit, or when they are jointly bound with them or by the

relations established by the indivisibility of prestations among those
having a right to demand them, or the obligation to satisfy the same."
(Emphasis added.)

30

Montalvo-Huertas v. Rivera-Cruz, 885 F.2d 971, 975-76 (1st Cir. 1989)

(citing A & P Gen. Contractors, Inc. v. Asociacion Cana, Inc., 110

P.R. Dec. 753 (1981)), and that "virtual representation does not exist

between two plaintiffs merely because they raise similar [factually-

related] claims," Terrell v. De Conna, 877 F.2d 1267, 1271 (5th Cir.

1989); see also Diaz v. Naiveras, 118 P.R. Dec. 297 (1987) (privity

not established by familial relationship). Yet nonintervenors'

federal complaint is distinctive in two significant respects one

substantive and one procedural. The nonintervenors' complaint hinges

entirely on their proving that the neighbors harbored the alleged

discriminatory intent to exclude the residents as a group from the JDA

housing development; in no sense does it focus on any particular

resident as an individual target of the alleged discrimination. Thus,

whatever circumstantial differences may exist among individual Casa

Marie residents are entirely irrelevant to the merits of their Title

VIII claims. Cf. Wilder v. Thomas, 854 F.2d 605, 620 (2d Cir. 1988)

(holding that two nonparties were bound where all federal plaintiffs

alleged imminent injury from lack of environmental impact study on

construction project, and the issues raised in the state and federal

proceedings "do not vary according to individual plaintiffs"), cert.

denied, 489 U.S. 1053 (1989). Each Casa Marie resident, intervenor

and nonintervenor alike, at all times had, and still has, ample

incentive to litigate vigorously against the threatened injury to the

federally protected interests common to all residents, namely the

closure of Casa Marie.

31

No less importantly, the "virtual representation" inquiry in

the present case arises in the context of a post-judgment proceed-

ing.15 Given the vital "finality" interests engendered by their

valid judgments, we doubt very seriously that the Commonwealth courts

would sanction successive attempts by individual Casa Marie residents

to restrain the enforcement of the final Superior Court judgment an

unavoidable result, nonetheless, should individual residents be

allowed successively to assert lack of privity in these circumstances.

See, e.g., Petit v. City of Chicago, 766 F. Supp. 607, 611-12 (N.D.

Ill. 1991) (res judicata rules of "representation" should discourage

tactical maneuvering by parties); see generally Restatement (Second)

of Judgments 62 (1981) (nonparty may be barred from relitigation of

claim if, by his conduct, he induced justifiable expectation that he

would "govern his conduct by the judgment in the original action").

We are particularly reluctant to extend the protection of

the "strangers" exclusion in the present action, as it has been

utilized so seldom by the Supreme Court that its continued vitality

has even been questioned. See, e.g., County of Imperial, 449 U.S. at

60-61 (Powell, J., concurring) ("I record my willingness to reconsider

Hale. It has rarely been cited and as the Court reads it today

it creates an exception to the coverage of the Anti-Injunction Act

15As with most general rules, an exception has been recognized to the
no-duty-to-intervene rule in certain "specialized proceedings, such as
bankruptcy, reorganization, or probate proceedings, where a party may
be barred from future litigation by his mere failure to intervene."
Griffith v. Burns, 570 F.2d 1065, 1071 n.7 (1st Cir. 1978).

32

that I think is contrary to the policy of that Act."). Moreover,

withholding the "strangers" exclusion under the Anti-Injunction Act

has less drastic repercussions for the federal plaintiffs than would a

formal res judicata determination. Federal court abstention would not

divest the federal plaintiffs of their right to litigate their Title

VIII claims, but merely restrict them to the available Commonwealth

forum. More importantly, of course, where the case for "virtual

representation" is so compelling, and the effects of the "strangers"

exclusion so obtrusive, the exercise of a federal court's narrowly

confined power to enjoin a pending state court proceeding must be

considered at its most suspect extension.16

b. Younger Abstention.

Even assuming the nonintervenors were somehow to escape the

strictures of the Anti-Injunction Act, we believe Younger abstention

would prevent federal relief enjoining enforcement of the Superior

Court contempt decree. In an apparent corollary to the "strangers"

exclusion, the Supreme Court has intimated that Younger abstention

might not apply in some instances to a federal plaintiff who was not a

16A federal court may abstain where a question relating to the proper
interpretation of state law might resolve a pivotal issue in the
federal case, obviating the need to resolve the federal claims.
Pennzoil, 481 U.S. at 11-12; Duty Free Shop, Inc. v. Administracion de

Terrenos, 889 F.2d 1181, 1182 (1st Cir. 1989). Intervenors attempted

to intervene in the contempt proceeding based on a claim asserted
under the Puerto Rico Bill of Rights for Aged Persons. If the nonin-
tervenors were to be considered adequately "represented" by the
intervenors, the Superior Court ultimately might rest its decision
solely on the state-law claim.

33

party, or not "closely related" to a party, in the pending state court

proceeding. See Doran v. Salem Inn, Inc., 422 U.S. 922, 928-29

(1975). "While there plainly may be some circumstances in which

legally distinct parties are so closely related that they should all

be subject to the Younger considerations which govern any one of them,

this is not such a case." Id. (emphasis added); see also Trainor, 431

U.S. at 440 (doctrine invoked only "when litigation between the same

parties and raising the same issues is . . . pending in a state

court") (emphasis added); Steffel v. Thompson, 415 U.S. 452, 461-62

(1974); Roe v. Wade, 410 U.S. 113, 125-27 (1973); Sullivan v. City of

Pittsburgh, 811 F.2d 171, 177-78 (3d Cir.) (federal plaintiffs not

parties to ongoing zoning proceeding, and not sufficiently "related"

to parties therein), cert. denied, 484 U.S. 849 (1987); Family Div.

Trial Lawyers v. Moultrie, 725 F.2d 695, 702-03 (D.C. Cir. 1984)

(lawyers' federal "equal protection" and "takings" claims cognizable

in federal court where lawyers not parties to state "neglect" proceed-

ings); Robinson v. Stovall, 646 F.2d 1087, 1090-93 (5th Cir. 1981)

(federal plaintiff with section 1983 claim never arrested or tried for

violation of challenged statute). The distinction Doran draws between

the terms "legally distinct" and "closely related" strongly suggests

that Younger's "close relationship" exclusion is far more narrow than

the "strangers" exclusion under the Anti-Injunction Act, and may

require federal plaintiffs who are not in strict privity to return to

state court to litigate their federal claims where it is evident that

their interests are sufficiently "intertwined" with the interests of

34

parties to the state court proceedings. Hicks v. Miranda, 422 U.S.

332, 348-49 (1975) (interests of theatre and its employees in chal-

lenging obscenity statute held to be closely related).17

We do not think the narrow exclusion described in Doran pre-

cludes Younger abstention in relation to these nonintervenors' Title

VIII claims. First, Doran and much of its progeny involve state

criminal or administrative proceedings which provide no procedural

mechanism which would enable nonparties to intervene to protect their

interests. See, e.g., New Jersey-Philadelphia Presbytery of Bible

Presbyterian Church v. New Jersey State Bd. of Higher Educ., 654 F.2d

868, 882 (3d Cir. 1981) (where party is absolutely barred from inter-

vention in state court proceedings, Younger abstention is never war-

ranted).18 Thus, such state criminal and administrative proceedings

would not satisfy an essential element of the Middlesex test, which

requires that the nonparties have a meaningful opportunity to raise

17Evolving Supreme Court abstention jurisprudence suggests that the
principles underlying Younger abstention may ordain more deference to

state court proceedings than the Anti-Injunction Act in some circum-
stances. For example, while section 1983 claims come within an
"express" exception to the Anti-Injunction Act, such claims may still
be subject to Younger abstention. See Younger, 401 U.S. at 54.

18For example, Doran involved a federal plaintiff's challenge to a

state statute which was the subject of an ongoing criminal prosecution

against co-plaintiffs. Of course, nondefendants are barred from
intervention in a criminal proceeding. While the federal plaintiff in
Doran did not directly seek to enjoin the state criminal proceeding,

interim federal relief would have had the effect of (1) "interfering"
with the state prosecution and (2) depriving the state court of its
ability to decide the merits of the federal defenses. See New Jersey-

Philadelphia, 654 F.2d at 880 (3d Cir. 1981) (Doran exclusion applies

whether interference with state court proceeding is direct or indi-
rect).

35

their federal claims in the pending state court proceeding. Mid-

dlesex, 475 U.S. at 432. In the present case, we have no reason to

doubt that nonintervenors, and intervenors alike, would be entitled

under the Puerto Rico Rules of Civil Procedure to intervene as of

right in the enforcement-contempt proceeding, and the nonintervenors

to join in the intervenors' independent action. See P.R. Laws tit.

32, App. III, R. 21.1 (intervention allowed "when the applicant claims

a right or interest relating to the property or transaction which is

the subject of the action which may as a practical matter be impaired

by the final disposition of the action"); Chase Manhattan Bank v.

Nesglo, Inc., 111 P.R. Dec. 767, 769 (1981) (noting liberality with

which Rule 21 motions should be granted; unlike federal rule, appli-

cants need not prove that their interests are not "adequately repre-

sented" by existing parties, and failed intervention lacks res judica-

ta effect).

Second, unlike the Doran-type setting in which unrelated,

legally distinct parties happen to mount separate but simultaneous

legal challenges to the constitutionality of a state statute, the

present case involves nonintervenor "co-lessees" with a common land-

lord, who took no action until after the Superior Court judgment was

entered, even though they had actual knowledge that a Superior Court

judgment threatened the very injury they now decry as patently collu-

36

sive and "discriminatory."19 Understandably, of course, the noninter-

venors may have hoped that Casa Marie would prevail, obviating the

need to litigate their Title VIII defenses. Even so, once again they

delayed, while the neighbors obtained a contempt decree against Casa

Marie. By delaying until so late in the litigation, intervenors and

nonintervenors withheld defenses the presentation of which may well

have aided the Superior Court in its evaluation of the neighbors'

state-law claims and its determination of a measured remedy for Casa

Marie's zoning law violations. More importantly, the nonintervenors'

delay until after entry of the contempt decree necessarily meant that

the district court, were it to grant the nonintervenors injunctive

relief, effectively would be placed in the apparent position of

actively condoning Casa Marie's contumacious disregard of the Superior

Court judgment.

These grave concerns nonetheless do not, in our view,

warrant depriving nonintervenors of the opportunity to assert their

Title VIII claims in the Commonwealth courts. Rather, as a deterrent

to future engenderment of needless federal-state court tensions, we

conclude that nonintervenors should be held to have waived their

19The nonintervenors, not having been joined in the neighbors' Superi-
or Court complaint, probably could have chosen to press their federal
claims in federal court prior to the entry of the judgment and con-
tempt decree, subject only to the less imposing obstacle of Colorado

River abstention. See Colorado River Water Conserv. Dist. v. United

States, 424 U.S. 800 (1976) (to avoid duplicative litigation, federal

court may abstain from exercising concurrent jurisdiction over federal
claims only in "exceptional circumstances"); see also Rivera-Puig v.

Garcia-Rosado, F.2d , (1st Cir. 1992) [No. 92-1239, 92-

1397, slip op. at 21 (1st Cir. Dec. 18, 1992)].

37

belated claims for discretionary federal equitable relief enjoining

the enforcement of the final Superior Court judgment.

Finally, we think it cannot reasonably be contended that

nonintervenors' interests are no longer sufficiently "intertwined"

with those of Casa Marie as to implicate Younger abstention. Cf.

Collins v. County of Kendall, 807 F.2d 95, 101-02 (7th Cir. 1986)

(plaintiff cannot simultaneously bring a claim which asserts that his

interests are interconnected with other parties, then deny their close

relationship for Younger purposes), cert. denied, 483 U.S. 1005

(1987). "[A] person who is not bound by a judgment under the rules of

res judicata may obtain a determination that the judgment is ineffec-

tive as to him through an action to restrain enforcement of the

judgment . . . when . . . [t]he existence of the judgment jeopardizes

a protectible interest of his; and . . .[t]he character of his inter-

est warrants his being given relief forthwith rather than on a future

occasion." Restatement (Second) of Judgments 76 (1982). But though

a nonjoined third party may rest assured that a final judgment by

which he is not bound will not affect his substantive legal rights, he

may not escape entirely the coincident implications attendant on the

entry of the valid state court judgment, or the interests of the State

in "vindicat[ing] the regular operation of its judicial system," see

Juidice, 430 U.S. at 335.

It is one thing for a stranger to attack a judg-
ment when it is set up against him, another for
him to be allowed to enjoin its enforcement or
otherwise to initiate proceedings to have it de-

38

clared invalid. . . . If the judgment really does
threaten him, the question remains whether there
are competing interests to be considered, particu-

larly the interests of the parties who are conced-

edly bound by the judgment. Giving the applicable

legal relief from the effects of the judgment on
him will not dissolve its legal effects on the
parties to the judgment.

Restatement (Second) of Judgments 76 cmt. c (1982) (emphasis added).

Once a valid judgment becomes final, so as to define the

status quo, its enforcement is not precluded merely because the

interests of those who seek to restrain its enforcement might be

affected. Furthermore, absent unambiguous evidence that the state

court rendered its final judgment in a discriminatory or otherwise

impermissible manner, see supra Section II.A., prudential consider-

ations normally will warrant federal court deference to the state

court's assessment of any competing interests belatedly presented to

the federal court which might warrant relief from the enforcement of

the state court judgment.

We mention a relevant example. Title VIII does not require

a showing that discriminatory intent was the sole factor, but rather a

substantial factor motivating defendants' conduct. See, e.g., United

States v. Birmingham, 727 F.2d 560, 562 (6th Cir.), cert. denied, 469

U.S. 821 (1984); Smith v. Town of Clarkton, 682 F.2d 1055, 1065 (4th

Cir. 1982).20 On the other hand, no liability arises under Title

20Four considerations are pertinent to the evaluation of Title VIII
claims under section 3604. First, plaintiff has the threshold burden
to show a discriminatory effect or impact that the housing practice
"actually or predictably results in discrimination as defined under

39

VIII absent a sufficient causal link between the defendants' discrimi-

natory actions and the threatened injury to the plaintiffs. See,

e.g., Gomez v. Chody, 867 F.2d 395, 401 (7th Cir. 1989) (where apart-

ments would have been closed anyway because unfit for habitation,

alleged discriminatory purpose of landlord in evicting was too attenu-

ated); see also Edwards v. Johnson County Health Dep't., 885 F.2d

1215, 1221 n.14 (4th Cir. 1989). In the present case, nonintervenors

allege that the neighbors' actions, motivated by a discriminatory

section 3604," Huntington Branch, NAACP v. Town of Huntington, 844

F.2d at 933, 934 (2d Cir. 1988); United States v. City of Black Jack,

508 F.2d 1179, 1184-85 (8th Cir. 1974), cert. denied, 422 U.S. 1042

(1975), or results in a disproportionate burden on members of a class
protected by Title VIII. Edwards v. Johnson County Health Dep't., 885

F.2d 1215, 1223 (4th Cir. 1989). Second, although direct proof of the

defendant's discriminatory intent is not essential for purposes of
Title VIII, see, e.g., Village of Bellwood v. Dwivedi, 895 F.2d 1521,

1533 (7th Cir. 1990); Huntington Branch, 844 F.2d at 934; United

States v. Starrett City Assocs., 840 F.2d 1096, 1100 (2d Cir.), cert.

denied, 488 U.S. 946 (1988); Betsey v. Turtle Creek Assocs., 736 F.2d

983, 986 (4th Cir. 1984); Robinson v. 12 Lofts Realty, Inc., 610 F.2d

1032, 1036 (2d Cir. 1979), plaintiff may bolster the evidence of

discriminatory effect by introducing direct evidence, such as state-
ments made by the defendant, that the defendant acted out of a dis-
criminatory animus. Third, once the plaintiff has established a prima

facie case of discriminatory effect, the burden shifts to the defen-

dant to advance some legitimate and nondiscriminatory reason for his
actions. See, e.g., Asbury v. Brougham, 866 F.2d 1276, 1279 (10th

Cir. 1989); Huntington Branch, 844 F.2d at 933; Robinson, 610 F.2d at

1039. And fourth, the factfinder must weigh the evidence of discrimi-
natory effect or intent against the proffered justifications for the
defendant's actions. In this balancing process, the court must
consider the type of relief sought by plaintiff. Where plaintiff

seeks a judgment which would require defendant to take affirmative
action to correct a Title VIII violation, plaintiff must make a
greater showing of discriminatory effect. On the other hand, if
plaintiff seeks a judgment merely enjoining defendant from further
interference with the exercise of plaintiff's Title VIII rights, a
lesser showing of discriminatory effect would suffice. See Metropoli-

tan Hous. Dev. Corp. v. Village of Arlington Heights, 558 F.2d 1283,

1290 (7th Cir. 1977), cert. denied, 434 U.S. 1025 (1978).

40

animus against "persons of a handicap," were the cause of Casa Marie's

closure, even though they must also concede that, at the time of the

Superior Court judgment, Casa Marie's noncompliance with the zoning

laws was an additional, antecedent, and efficient cause for the entry

of the adverse judgment against Casa Marie.21 To enforce a zoning

ordinance under P.R. Laws Ann. tit. 23, 71x, 72 (1987), a private

citizen apparently need only show that the defendant has violated the

zoning laws. See supra note 3. In contrast, the district court's

consideration of the federal plaintiffs' request for injunctive relief

immersed the court in speculation as to whether the Superior Court, in

assessing the threat posed by Casa Marie's continued operation,22

21Although the Superior Court noted that Casa Marie would remain in
violation of the JDA restrictive covenants even if A.R.P.E. later
excused Casa Marie's noncompliance with the zoning ordinances, nothing
in its opinion intimates that the zoning violations were not deemed
independent grounds for the closure. Appellees contended at oral

argument that they had cured their zoning violations subsequent to the
entry of the district court's permanent injunction. In our view,
however, the district court impermissibly involved itself in the
speculative inquiry whether Casa Marie would (or could) bring itself
into compliance with the zoning ordinances after entry of the Superior
Court judgment. Once again, prudential considerations militated
strongly in favor of deferring to the Superior Court as the more
appropriate forum in which to present evidence and consider any

unadjudicated claims for injunctive relief from the enforcement of the
final Superior Court judgment.

22The Superior Court is in the optimal position to adjudge whether
compliance with the zoning ordinances should be "waived." Discrimina-
tion against handicapped persons is specifically defined for purposes
of section 3604(f) as (a) "a refusal to permit, at the expense of the
handicapped person, reasonable modifications of existing premises

occupied or to be occupied by such person if such modifications may be
necessary to afford such person full enjoyment of the premises," and
(2) "a refusal to make reasonable accommodations in rules, policies,

practices, or services, when such accommodations may be necessary to

afford such person equal opportunity to use and enjoy a dwel-

41

would compel closure irrespective of any discriminatory intent on the

part of the neighbors.23

We do not lightly conclude that there was an implied waiver

of nonintervenors' statutory right to assert their Title VIII claims

in a federal forum. Nevertheless, their delay in resorting to the

federal forum until the Superior Court contempt decree had been

entered cannot be countenanced without encouraging the very sort of

egregious intrusion upon state judicial power which Younger abstention

was designed to avert. See supra Section II.B.1.b.

III

CONCLUSION

We vacate the permanent injunction restraining the neigh-

bors' enforcement of the Superior Court judgment and their enforcement

of the outstanding contempt decree against Casa Marie. As our absten-

tion ruling rests on the assumption that the residents will be accord-

ling. . . ." 42 U.S.C. 3604(f)(3) (A)-(B) (emphasis added).
Section 3604(f)(9) prescribes a limitation on the required "reasonable
accommodation," providing that "[n]othing in this subsection requires
that a dwelling be made available to an individual whose tenancy would
constitute a direct threat to the health or safety of other individu-
als or whose tenancy would result in substantial physical damage to
the property of others."

23We cannot ignore the possibility that the Superior Court may find
that two substantial causes contributed to Casa Marie's closure. It

might ultimately determine that Casa Marie's noncompliance with the
zoning laws requires closure, but that the neighbors nevertheless are
liable in damages to Casa Marie's residents for resorting to the
zoning laws and the restrictive covenants for discriminatory purposes.
We believe these matters are suitably left to the Commonwealth courts.

42

ed an adequate "opportunity" to participate in the Commonwealth

proceedings, however, we anticipate that the Superior Court, as it has

to date out of respect for the principles of comity and federalism

will defer further enforcement of its judgment and contempt decree,

for such reasonable time as it may allow, to permit the filing and

consideration of the residents' motions to intervene in the enforce-

ment proceeding, or in the alternative, to permit intervenors to

prosecute their independent action.

The district court judgment is vacated. Judgment shall enter

for appellants on appellees' section 1983 claims. Double costs are

awarded against Casa Marie and its owners.

43